UNITED STATES of America

v.

Gerald F. JOHNSON, Appellant.

UNITED STATES of America

v.

Thomas JOHNSON, Appellant.

UNITED STATES of America

v.

Edward T. WOOTEN, Appellant.

Nos. 82–1163, 82–1164 and 82–1336.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 17, 1982.

Decided Dec. 21, 1982.

As Amended Dec. 21, 1982.

Roger C. Spaeder, Washington, D.C., with whom Richard Stern, Washington, D.C. (appointed by this Court) was on the brief, for appellants in Nos. 82–1163 and 82–1164.

William J. Garber, Washington, D.C. (appointed by this Court), for appellant in No. 82–1336.

Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., John A. Terry, Asst. U.S. Atty., Washington, D.C., at the time the brief was filed, and C. Madison Brewer, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before WRIGHT, MIKVA, and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge EDWARDS.

Separate opinion, concurring in part and dissenting in part, filed by Circuit Judge MIKVA.

HARRY T. EDWARDS, Circuit Judge:

These three appeals seek the reversal of convictions, based largely on the fruits of electronic surveillance authorized under the District of Columbia Code ("D.C.Code"),[1] for violations of the federal Controlled Substances Act.[2] Because the appellants present common questions concerning the Government's compliance with the D.C. Code's wiretapping provisions, we resolve all three appeals in this opinion. For the reasons set forth below, we reject each of the grounds on which the appellants urge suppression of the electronically obtained evidence,[3] and we affirm the convictions.

---

1. D.C.Code Ann. §§ 23–541 to 23–556 (1981).

2. Pub.L. No. 91–513, tit. II, 84 Stat. 1236, 1242 (1970) (codified as amended at 21 U.S.C. §§ 801–966 (1976 & Supp. IV 1980)).

3. We also reject appellant Wooten's independent challenges to the legality of a search of his car that resulted in the seizure of incriminating evidence. See note 21 infra.

## I. BACKGROUND

On June 9, 1980, Assistant United States Attorney C. Madison Brewer applied to District Judge Joyce Hens Green for an order permitting the Metropolitan Police Department to intercept communications to and from appellant Wooten's home phone concerning "the unlawful possession, manufacture and sale of narcotic drugs" in violation of the D.C.Code.[4] Because the supporting affidavit was submitted by a nonfederal official, Detective William Larman, and the surveillance was to be conducted by the local police, the application was made under the D.C.Code rather than under Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. §§ 2510–2520 (1976 & Supp. IV 1980).[5] Judge Green was informed, however, that, if the wiretap was successful, "evidence . . . [would] be presented to a Federal Grand Jury for its consideration of violations of 21 U.S.C. §§ 841(a), 843(b), and 846 (distribution and possession with intent to distribute, use of a telephone facility, and conspiracy)."[6]

Before filing his application, Brewer submitted the proposed order and supporting documentation to United States Attorney Charles Ruff for his approval. Although Ruff did not approve Brewer's application in writing, the record reveals,[7] and the appellants conceded in the oral argument before this court, that Ruff actually authorized the application. Pursuant to established Justice Department policy,[8] Ruff then directed Brewer to seek the approval of the Attorney General or a specially designated Assistant Attorney General.[9] Assistant Attorney General Phillip Heymann subsequently authorized the application in a letter to Ruff, which Brewer appended to the document filed with Judge Green.[10] Notwithstanding the incorrectness of Brewer's statement that "[t]he memorandum of authorization signed by Mr. Ruff is attached to this application,"[11] Judge Green entered an order permitting wiretapping by the Metropolitan Police, specifically noting probable cause for local narcotics offenses relating to heroin and cocaine trafficking.[12]

During the period covered by the June Order, the Metropolitan Police intercepted a large number of calls discussing narcotics trafficking and at least one call referring to Preludin (phenmetrazine), a nonnarcotic schedule III controlled substance,[13] arrested three persons, and seized 1600 tablets of Preludin. Because the goals of the intercept had not been fully realized, Brewer applied for an extension of the Order on July 9. The Justice Department's internal authorization procedure for this application paralleled that used for the June Application,[14] and Judge Green's Order recited that the interception had been authorized by "Assistant Attorney General . . . M. Carr Ferguson, and his designee, . . . Charles F.C. Ruff, U.S. Attorney for the District of Columbia."[15]

Like the initial request for permission to wiretap, the July Application informed

---

4. Application of the United States for an Order Authorizing the Interception of Wire Communications ("June Application"), *reprinted in* Appellants' Appendix ("App.") 78, 79.

5. June Application, App. 80 n. 2; *see* 18 U.S.C. § 2516 (1976 & Supp. IV 1980).

6. June Application, App. 80 n. 2.

7. *See* Transcript of June 22, 1981 Hearing on Motion to Suppress ("Tr.") 24–26, 28–30.

8. *See id.* at 24–25.

9. *See* 18 U.S.C. § 2516(1) (1976 & Supp. IV 1980) (authorizing delegation of Attorney General's authority to approve federal wiretaps).

10. *See* June Application, App. 83.

11. *Id.* at 78.

12. Order Authorizing Interception of Wire Communications ("June Order"), *reprinted in* App. 8, 9.

13. *See* 21 U.S.C. § 812(c) (1976).

14. *See* Application of the United States for an Order Authorizing the Interception of Wire Communication ("July Application"), *reprinted in* App. 108, 113.

15. Order Authorizing Extension of Interception of Wire Communications ("July Order"), *reprinted in* App. 11, 13.

Judge Green that federal prosecutions were likely.[16] The accompanying affidavit, moreover, indicated that the wiretap had provided evidence of trafficking in heroin, cocaine, Preludin, and other drugs, and had enabled officers to seize a large quantity of Preludin.[17] Nevertheless, Judge Green's Order did not explicitly mention Preludin; like the original Order, it referred to "a narcotic operation involving heroin and cocaine."[18]

When the period of interception authorized by the July Order expired on August 8, 1980, the tapes were prepared for sealing and placed in a police safe in a condition that ensured that they would not be tampered with or disclosed.[19] They were not judicially sealed, however, until August 13, four-and-one-half days later. The principal reason for the delay was that Judge Green was unavailable. Brewer did attempt to contact District Judge John Penn, the motions judge to whom he believed the matter had been referred, but this effort was frustrated by the emergency appeals that occupied Judge Penn's schedule. Brewer made no effort to contact other judges at either their offices or their homes.

■ On March 31, 1981, the appellants were indicted by a federal grand jury as members of a conspiracy to distribute and to possess with intent to distribute Preludin in violation of 21 U.S.C. § 846 (1976). Appellants Gerald Johnson and Wooten were also charged with possessing Preludin with an intent to distribute and using a telephone to commit and facilitate the crimes, in violation of 21 U.S.C. §§ 841(a) and 843(b) (1976). After moving unsuccessfully to suppress the evidence derived from the wire intercepts,[20] the appellants were convicted as charged in stipulated nonjury trials. These appeals, which challenge District Judge John Pratt's denial of the motion to suppress, followed.[21]

## II. DISCUSSION

Appellants urge suppression of the wiretap evidence and reversal of their convic-

16. July Application, App. 110 n. 2.

17. *Id.* at 114–15.

18. July Order, App. 12.

19. Tr. 17–18.

20. *United States v. Wooten,* Crim. No. 81–74 (D.D.C. July 14, 1981), *reprinted in* App. 17.

21. Wooten also challenges Judge Pratt's denial of his motion to suppress 301 tablets of Preludin seized during a search of his car. He claims that the search was illegal because it was predicated on the fruits of an illegal wiretap and because the affidavit in support of the search warrant did not reveal that the source of some of its information was a court-ordered wiretap. Our conclusion that the wiretap was legal vitiates Wooten's primary argument. His second claim fails when tested against the standard established in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), for challenges to the accuracy of search warrant affidavits. Under the *Franks* test, one making such a challenge must demonstrate "that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Id.* at 155–56, 98 S.Ct. at 2676. "Allegations of negligence or innocent mistake are insufficient." *Id.* at 171, 98 S.Ct. at 2684. If, and only if, intentionally or recklessly made misstatements in a search warrant affidavit were necessary to the finding of probable cause, the search warrant will be voided and its fruits suppressed. *Id.* at 171–72, 98 S.Ct. at 2684.

Although the reasoning of *Franks* "logically extends ... to material omissions," 2 W. LA-FAVE, SEARCH AND SEIZURE § 4.4 (Supp.1982), Wooten cannot demonstrate that the omission here was necessary to the finding of probable cause. We note, however, that an affiant's failure to inform the magistrate that some of his evidence was obtained through electronic surveillance could, under some circumstances, affect the finding of probable cause, and we suggest that the Government should, whenever possible, inform the magistrate that tapes are available for his review. Although the Government need not disclose the identity of its informants, *see, e.g., McCray v. Illinois,* 386 U.S. 300, 311, 87 S.Ct. 1056, 1062, 18 L.Ed.2d 62 (1967), considerations such as the safety of witnesses, which militate against disclosing informants' identities, do not apply to electronic surveillance. A magistrate, moreover, may be both more willing and better able to review information revealed by a wiretap than information provided by an informant in the field. Particularly where the recorded statements are ambiguous and do not directly mention illegal transactions, their review by a neutral magistrate could provide a needed check on overly zealous law enforcement officials.

tions on the basis of a number of alleged violations of the D.C.Code. They argue that (1) Brewer's applications for permission to intercept their conversations were not properly authorized, (2) Judge Green lacked jurisdiction to approve electronic surveillance in an investigation of local offenses conducted solely by local officials, (3) the availability of other effective investigative techniques rendered wiretapping unnecessary, (4) the intercepted communications were improperly used to secure convictions for offenses not targeted for investigation, (5) the Government failed adequately to explain its delay in sealing the tapes upon the termination of the surveillance, and (6) the United States Attorney did not comply with the D.C.Code's annual reporting requirement. We will address these contentions in order. Before doing so, however, we must expound the standards governing the suppression of intercepted communications under the D.C.Code.

## A. Standards Governing Suppression

### 1. Introduction

An "aggrieved person" [22] may secure the suppression of wire or oral communications

intercepted pursuant to the D.C.Code and evidence derived therefrom if:

(1) the communication was unlawfully intercepted;

(2) the order of authorization or approval under which it was intercepted is insufficient on its face;

(3) the interception was not made in conformity with the order of authorization or approval;

(4) service was not made as provided in section 23–547; or

(5) the seal prescribed by section 23–549(a) is not present and there is no satisfactory explanation for its absence.[23]

The challenges raised in these appeals implicate only two of these potential grounds for suppression. One concerns subsection (1), which requires suppression only if communications are "unlawfully intercepted." [24] Before turning to the particular grounds for suppression, we will first seek to elucidate the meaning of "unlawfully intercepted."

The other challenge concerns subsection (5), which requires a determination whether

**22.** An "aggrieved person" is defined in D.C. Code Ann. § 23–541(9) (1981) as "a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed." The appellants fall within this definition, and so have standing to challenge the Government's use of the electronically obtained evidence.

**23.** D.C.Code Ann. § 23–551(b) (1981).

**24.** Judge Green's authorization orders, which contained all of the information required by D.C.Code Ann. § 23–547(e) (1981), were facially sufficient. Although one could contend that the failure of the United States Attorney to authorize the applications in writing, as required by D.C.Code Ann. § 23–546(a) (1981), rendered the orders facially insufficient, a similar argument was rejected by the Supreme Court in United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), and United States v. Chavez, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974), two cases decided under 18 U.S.C. § 2518(10)(a), Title III's analogue to § 551(b). In Giordano, the court of appeals had held that suppression was required on the theory that the absence of any valid authorization of the wiretap application was the equivalent of failing to identify at all in

the interception order the person who authorized the application, rendering the order "insufficient on its face." Manifestly, however, the order, on its face, clearly, though erroneously, identified Assistant Attorney General Wilson as the Justice Department officer authorizing the application, pursuant to special designation by the Attorney General. As it stood, *the intercept order was facially sufficient* under § 2516(1), and *despite what was subsequently discovered,* the Court of Appeals was in error in justifying suppression under § 2516(10)(a)(ii).

416 U.S. at 525 n. 14, 94 S.Ct. at 1831 n. 14 (emphasis added). The Court reiterated this conclusion in Chavez. See 416 U.S. at 573–74 & n. 5, 94 S.Ct. at 1855 & n. 5; see also In re Marcus, 491 F.2d 901, 904 (1st Cir.), vacated, 417 U.S. 942, 94 S.Ct. 3064, 41 L.Ed.2d 663 (1974); United States v. Marcello, 508 F.Supp. 586, 603 (E.D.La.1981). For further discussions of the meaning of facial insufficiency, see United States v. Acon, 513 F.2d 513, 516–19 (3d Cir.1975); United States v. Baynes, 400 F.Supp. 285, 306–10 (E.D.Pa.1975); C. FISHMAN, WIRETAPPING AND EAVESDROPPING § 256 (1978 & Supp. 1981).

the Government offered a "satisfactory explanation" for the delay in securing a judicial seal for the tapes. This second ground will be discussed in Part II.B.4. *infra.*

### 2. *The Meaning of "Unlawfully Intercepted"*

In construing the phrase "unlawfully intercepted," we look first to the statutory language that Congress used to express its intent.[25] Fidelity to Congress' literal language, always a primary goal of statutory construction, is especially important in interpreting the D.C.Code's wiretapping provisions, which constitute a comprehensive scheme for regulating the interception of wire and oral communications.[26] The statute's broad scope justifies our assumption that Congress drafted the District's wiretapping law, like its federal counterpart, "with exacting precision." [27] As a result, "the exact words of the statute provide the surest guide to determining Congress' intent." [28]

The meaning of the phrase "unlawfully intercepted," however, is not self-evident, and nowhere in either the wiretapping statute or its legislative history did Congress undertake to define it.[29] The Conference Report, for example, specified the grounds for suppression, but did not explain them.[30] And while the House Report indicated that "[t]he proposed sections conform virtually word for word with the corresponding sections of the federal wiretap law incorporating the identical procedural safeguards, protections, and restrictions," [31] the legislative history of the federal statute is similarly unhelpful.[32]

If we were writing on a clean slate, we might feel free to balance Congress' dual goals—"protect[ing] effectively the privacy of wire and oral communications" and "aid[ing] . . . law enforcement and the administration of justice," [33]—by holding that communications are "unlawfully intercepted" *whenever* the Government fails to comply precisely with any of the procedures established by the wiretapping statute. Under this reading, however, sections 551(b)(2) through 551(b)(5) would be "drained of meaning," *United States v. Chavez,* 416 U.S. 562, 575, 94 S.Ct. 1849, 1856, 40 L.Ed.2d 380 (1974), and would become mere surplusage, *United States v. Giordano,* 416 U.S. 505, 526, 94 S.Ct. 1820, 1831, 40 L.Ed.2d 341 (1974). Although Congress may have intended just such redundancy,[34] the Supreme Court has held that it

---

25. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

26. *See* S.Rep. No. 538, 91st Cong., 1st Sess. 18 (1969) [hereinafter cited as S.Rep. No. 538].

27. *United States v. Donovan,* 429 U.S. 413, 441, 97 S.Ct. 658, 674, 50 L.Ed.2d 652 (1977) (Burger, C.J., concurring in part and concurring in the judgment).

28. *Id.; accord Zerilli v. Evening News Ass'n,* 628 F.2d 217, 220 (D.C.Cir.1980); *cf. United States v. Giordano,* 416 U.S. 505, 514, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974) (Title III designed to prohibit "all interceptions of oral and wire communications except those specifically provided for in the Act").

29. In fact, to the extent that the phrase has a clear meaning, the legislative history obscures it. After specifying the grounds for a motion to suppress, the Conference Report concluded: "*If the motion is granted, the contents of the intercepted wire or oral communication,* or evidence derived therefrom, *shall be treated as having been obtained in violation of this subchapter* and shall not be received in evidence in the trial, hearing, or proceeding." H.R.Rep. No. 1303, 91st Cong., 2d Sess. 238 (1970) (emphasis added).

30. *Id.; see also* H.R.Rep. No. 907, 91st Cong., 2d Sess. 77–79 (1970) [hereinafter cited as H.R. Rep. No. 907]; S.Rep. No. 538, *supra* note 26, at 18–25.

31. H.R.Rep. No. 907, *supra* note 30, at 77.

32. *See* S.Rep. No. 1097, 90th Cong., 2d Sess. 106, *reprinted in* 1968 U.S.Code Cong. & Ad. News 2112, 2195–96 [hereinafter cited as S.Rep. No. 1097].

33. 18 U.S.C. § 2510 note (1976) (Title III); *see* S.Rep. No. 538, *supra* note 26, at 18.

34. *See United States v. Chavez,* 416 U.S. at 585–86, 94 S.Ct. at 1861 (Douglas, J., concurring in part and dissenting in part); J. Carr, The Law of Electronic Surveillance § 6.02[3] (1977).

did not,[35] and we can perceive no special local interest justifying a conclusion that Congress intended the phrase "unlawfully intercepted" to have a different meaning under the District of Columbia's wiretapping statute than under Title III.[36]

Our analysis of the legality of the interceptions must begin, therefore, with the Supreme Court's opinions in *Giordano* and *Chavez*, which held that not "every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications 'unlawful.'" *United States v. Chavez*, 416 U.S. at 574–75, 94 S.Ct. at 1855–1856. "To the contrary, suppression is required only for a 'failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.'" *United States v. Donovan*, 429 U.S. 413, 433–34, 97 S.Ct. 658 (1977) (quoting *United States v. Giordano*, 416

U.S. at 527, 94 S.Ct. at 1832). Implicit in the Court's opinions, which devote considerable attention to the purposes underlying the statutory requirements at issue, is the principle that violations of even these central requirements do not mandate suppression if the Government demonstrates to the court's satisfaction that the statutory purpose has been achieved despite the violation.[37] We will focus our inquiry on these considerations in determining whether the communications that led to the appellants' convictions were "unlawfully intercepted" within the meaning of section 551(b)(1).[38]

## B. *Possible Grounds for Suppression*

### 1. *Defective Authorization*

The appellants' principal objection to the wiretapping procedures followed by the Government in these cases is that the United States Attorney failed to authorize Brewer's applications in writing as required by D.C.Code Ann. § 23–546(a) (1981).[39]

---

**35.** In *Giordano* and *Chavez*, the Supreme Court was interpreting 18 U.S.C. § 2518(10)(a), which authorizes suppression if "(i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval."

**36.** *See generally* S.Rep. No. 538, *supra* note 26, at 18, 25.

**37.** *Cf. United States v. Caggiano*, 667 F.2d 1176, 1178–79 (5th Cir.1982); *United States v. Diana*, 605 F.2d 1307, 1312 (4th Cir.1979), *cert. denied*, 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980); *United States v. Lawson*, 545 F.2d 557, 564 (7th Cir.1975); *United States v. Chun*, 503 F.2d 533, 542 (9th Cir.1974) (adopting three-part test looking to centrality of provision and to whether its purpose has been attained; even if these inquiries do not mandate suppression, that remedy may be appropriate in the case of a deliberate violation designed to achieve a tactical advantage).

Although this court has not had occasion to adopt the *Chun* test, and we need not adopt it here, we have previously held that the Government's failure to comply with the D.C.Code's inventory requirement, D.C.Code Ann. § 23–550, "is not grounds for suppression if the ends of that requirement have otherwise been achieved." *United States v. Johnson*, 539 F.2d 181, 194 (D.C.Cir.1976), *cert. denied*, 429 U.S.

1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977). The *Johnson* court did, however, leave open the possibility that bad faith on the part of the Government could lead to the suppression of electronically obtained evidence even if the basic purpose of a requirement has been satisfied.

**38.** It has been suggested that "[l]ogically, nothing that happens *after* the interception of communications can affect whether it was lawful to intercept the communication in the first place." C. Fishman, *supra* note 24, at § 255 (Supp.1981) (emphasis in original); *see United States v. Vento*, 533 F.2d 838, 855 (3d Cir.1976). We do not agree and we hold that "the post-interception violations must also be scrutinized to determine if the failures to satisfy the statutory requirements directly and substantially affect the Congressional intention to limit the use of intercept procedures and to comply with Fourth Amendment principles." *United States v. Lawson*, 545 F.2d 557, 564 (7th Cir.1975); *see United States v. Donovan*, 429 U.S. at 432–34, 438–39, 97 S.Ct. at 670–671, 673 (by implication); *United States v. Chun*, 503 F.2d 533, 542 n. 18 (9th Cir.1974).

**39.** "The United States attorney may authorize, in writing, any investigative or law enforcement officer to make application to a court for an order authorizing the interception of wire or oral communications." D.C.Code Ann. § 23–546(a) (1981).

Section 546(a), its legislative history reveals, was intended to ensure that "[c]ontrol over all 'wiretapping' and 'bugging' activity in the first instance ... rest[s], directly or indirectly, in the hands of the U.S. attorney."[40] It is clear, therefore, that the United States Attorney for the District of Columbia[41] "is the only person who may authorize an application ... for electronic surveillance, consistent with the intent of Congress to centralize policy control ... in the chief prosecuting officer."[42] It is beyond cavil, moreover, that this limitation of the "publicly responsible official[s],"[43] who may authorize electronic surveillance under the D.C.Code is a "central or functional safeguard," *United States v. Chun*, 503 F.2d 533, 542 (9th Cir.1974), the violation of which requires suppression of intercepted communications.[44]

Section 546(a)'s requirement that the United States Attorney's authorization be given in writing is more difficult to characterize. Although one could argue that an oral authorization amounts to no authorization at all, several factors suggest that Congress may have envisioned that the writing requirement would play "[n]o role more significant than a reporting function designed to establish on paper that one of the major procedural protections of ... [the wiretapping legislation has] been accomplished." *United States v. Chavez*, 416 U.S. 562, 579, 94 S.Ct. 1849, 1858, 40 L.Ed.2d 380 (1974). We are not unimpressed by the fact that Congress chose to impose a writing requirement in the D.C.Code, but we do not believe that the mere difference in language between the D.C.Code and Title III indicates that a violation of the writing requirement of section 546(a) automatically demands suppression. Significantly, the legislative history is silent on the purpose of the writing requirement,[45] and the model act from which the requirement derived provides no clues as to the intended consequences of a violation.[46] A more limited role for the writing requirement is also consistent with the D.C.Code's provisions governing the contents of applications and court orders: An officer seeking permission to wiretap need not inform the court that the United States Attorney's authorization was given in writing or submit written authorization with his application,[47] and the court need not determine that the United States Attorney authorized the application in writing.[48]

■ On the present facts, we need not answer the difficult question whether section 546(a)'s writing requirement was intended to occupy a central or functional role in guarding against unwarranted use of electronic surveillance. The record indicates,[49] the District Court concluded, at

40. S.Rep. No. 538, *supra* note 26, at 19.

41. "[T]he term 'United States attorney' means the United States attorney for the District of Columbia or any of his assistants designated by him or otherwise designated by law to act in his place for the particular purpose in question." D.C.Code Ann. § 23–541(11) (1981).

42. H.R.Rep. No. 907, *supra* note 30, at 78. *See also* S.Rep. No. 1097, *supra* note 32, at 98, 1968 U.S.Code Cong. & Ad.News at 2187; *cf. United States v. Martinez*, 588 F.2d 1227, 1233 (9th Cir.1978) (analogous federal provision "is intended to make wiretap standards uniform, to provide for mature judgment by a responsible official, and to fix responsibility for electronic surveillance at a high level"); S.Rep. No. 1097, *supra* note 32, at 97, 101, 1968 U.S.Code Cong. & Ad.News at 2185, 2189 (discussing federal authorization provision).

43. S.Rep. No. 1097, *supra* note 32, at 97, 1968 U.S.Code Cong. & Ad.News at 2185.

44. *Cf. United States v. Giordano,* 416 U.S. 505, 515–28, 94 S.Ct. 1820, 1828–1832, 40 L.Ed.2d 341 (1974) (suppressing evidence obtained from wiretaps authorized under Title III by Executive Assistant to the Attorney General).

45. Congress did take pains to point out some of the significant differences between the District's wiretapping statute and Title III. *See, e.g.,* S.Rep. No. 538, *supra* note 26, at 21.

46. *See id.* at 18; Blakey & Hancock, *A Proposed Electronic Surveillance Control Act,* 43 Notre Dame Law. 657, 670 (1968) (§ 7(a) of proposed act).

47. *See* D.C.Code Ann. § 23–547(a)(1) (1981).

48. *See* D.C.Code Ann. § 23–547(e)(4) (1981).

49. *See* Tr. 24–26, 28–30; June Application, App. 83; July Application, App. 113.

least implicitly,[50] and the appellants conceded during the oral argument before this court, that United States Attorney Ruff not only *actually authorized* the applications, but also, pursuant to established Justice Department policy, sought and received the authorization of two Assistant Attorneys General who had been specifically designated to approve federal wiretap applications.[51] Under these circumstances, both the overarching purposes of section 546(a)—ensuring uniformity and political accountability—and the more limited evidentiary function of the writing requirement were clearly satisfied. Since there is no suggestion that the Government deliberately ignored section 546(a)'s writing requirement, our conclusion that the section's purposes have been fully satisfied disposes of the appellants' challenge.

### 2. Jurisdiction of the District Court

■ Appellants' second contention, that the District Court lacks jurisdiction to authorize electronic surveillance in an investigation of local offenses conducted solely by local officials, is meritless. As the appellants have conceded, D.C.Code Ann. § 23–547 (1981), read together with D.C.Code Ann. § 23–541(7) (1981), explicitly authorizes the issuance of wiretap orders by "a judge of the United States District Court for the District of Columbia."[52] Appellants' secondary thrust—that the inconsistency between the only reasonable construction of the D.C.Code and Title III[53] requires us to reject that reading—can be easily parried: Under D.C.Code Ann. § 23–556(b) (1981), the specific authorization provided by the local statute prevails over the more general jurisdictional allocation of Title III.

### 3. Availability of Normal Investigative Techniques

■ Appellants also maintain that the Government's application for judicial authorization to intercept their communications could not support the District Court's conclusion that "normal investigative procedures have or would have been tried and have or had failed or reasonably appear or appeared to be unlikely to succeed if tried or to be too dangerous."[54] Congress promulgated this necessity requirement to ensure "that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974). This purpose can be achieved, we have previously recognized, only by "giv[ing] close scrutiny to applications challenged for noncompliance and . . . reject[ing] generalized and conclusory statements that other investigative procedures would prove unsuccessful." *United States v. Williams,* 580 F.2d 578, 588 (D.C.Cir.) (footnotes omitted), *cert. denied sub nom. Lincoln v. United States,* 439 U.S. 832, 99 S.Ct. 112, 58 L.Ed.2d 127 (1978). The Government need show, however, only that "'other techniques are impractical under the circumstances and that it would be unreasonable to require pursuit of those avenues of investigation.'" *Id.* (quoting *United States v. Vento,* 533 F.2d 838, 849 (3d Cir.1976)).

Read as a whole, the affidavit accompanying the Government's wiretapping application[55] was neither superficial nor conclusory. It revealed that the wiretap was sought only after more than six months of extensive investigation, discussed a number of techniques that had been tried or con-

---

**50.** *See United States v. Wooten,* mem. op. at 2, *reprinted in* App. 18.

**51.** *See* 18 U.S.C. § 2516(1) (1976 & Supp. IV 1980).

**52.** *See* H.R.Rep. No. 907, *supra* note 30, at 174.

**53.** 18 U.S.C. § 2516(2) (1976) provides that an application by state law enforcement authorities investigating state offenses shall be con-

sidered by "a State court judge of competent jurisdiction." Under 18 U.S.C. § 2510(3) (1976), "state" includes the District of Columbia.

**54.** D.C.Code Ann. § 23–547(c)(3) (1981); *see* 18 U.S.C. § 2518(3)(c) (1976).

**55.** *See* June Application, App. 84–107.

sidered, and amply demonstrated the need for electronic surveillance *in this particular investigation.*[56] We can thus find no reason to reject the District Court's conclusion that the Government satisfied the D.C.Code's necessity requirement.

### 4. *Delay in Sealing the Recordings*

Appellants next contend that the Government did not offer a "satisfactory explanation" for its four-and-one-half day delay in sealing the tapes. D.C.Code Ann. § 23–549(a) (1981) mandates the acquisition of a judicial seal immediately after the termination of a wiretapping order, and section 551(b)(5) makes the absence of a seal without a satisfactory explanation a ground for suppression. Although the latter provision specifically refers only to the "absence" of a seal, an untimely sealing must also be explained to avoid suppression. *United States v. Gigante,* 538 F.2d 502, 507 (2d Cir.1976). Because it appears that the District Court may have given too much weight to the fact that "[t]here has been no claim that there has been bad faith or that the tapes were altered or that defendants were in any way prejudiced by the delay,"[57] we take this opportunity to clarify the applicable suppression standard.

Relying on a line of cases from the Third, Fifth, and Seventh Circuits,[58] the Government appears to argue that an unexplained delay does not require suppression unless the appellants present evidence of actual tampering with the tapes. "To demand such an extraordinary showing, however, would vitiate the Congressional purpose in requiring judicial supervision of the sealing process." *United States v. Gigante,* 538 F.2d at 505. As an exhaustive survey of the art concerning the authentication of magnetic tapes for legal purposes concluded, "[t]apes that are made for use in criminal investigations can be falsified, even by relatively unskilled persons, in ways that are superficially convincing. The necessary equipment is readily available, and the necessary techniques are easily learned."[59] Such alterations, moreover, are likely to go undetected because

> a highly skilled forensic examiner who is an expert in the fields of tape recording, signal analysis, and speech communication, using the best available analysis equipment, can take weeks and even months to establish with reasonable certainty the fact that a tape has been falsified. The advantage, in terms of effort, time, and cost is clearly with the forger.[60]

The judicial sealing requirement obviates the need for such costly and inconclusive examinations by providing "an external safeguard against tampering with or manipulation of recorded evidence." *United States v. Gigante,* 538 F.2d at 505.[61] Although we consider the possibility that the

---

**56.** *See United States v. Martinez,* 588 F.2d 1227, 1231–32 (9th Cir.1978); *United States v. Vento,* 533 F.2d at 849–50; *United States v. Kalustian,* 529 F.2d 585, 589–90 (9th Cir.1975); NATIONAL COMMISSION FOR THE REVIEW OF FEDERAL AND STATE LAWS RELATING TO WIRETAPPING AND ELECTRONIC SURVEILLANCE, ELECTRONIC SURVEILLANCE 14 (1976).

**57.** *United States v. Wooten,* mem. op. at 5, *reprinted in* App. 21.

**58.** *E.g., United States v. Diadone,* 558 F.2d 775, 780 (5th Cir.1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1239, 55 L.Ed.2d 765 (1978); *United States v. Lawson,* 545 F.2d 557, 564 (7th Cir. 1975); *United States v. Falcone,* 505 F.2d 478, 483–84 (3d Cir.1974), *cert. denied,* 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 432 (1975); *see United States v. Diana,* 605 F.2d 1307, 1312–16 (4th Cir.1979), *cert. denied,* 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980). *But see United States v. Angelini,* 565 F.2d 469, 473 (7th Cir.

1977), *cert. denied,* 435 U.S. 923, 98 S.Ct. 1487, 55 L.Ed.2d 517 (1978).

**59.** Weiss & Hecker, *The Authentication of Magnetic Tapes: Current Problems and Possible Solutions,* in NATIONAL COMMISSION FOR THE REVIEW OF FEDERAL AND STATE LAWS RELATING TO WIRETAPPING AND ELECTRONIC SURVEILLANCE, COMMISSION STUDIES 216, 237 (1976).

**60.** *Id.* at 224; *see Lopez v. United States,* 373 U.S. 427, 468, 83 S.Ct. 1381, 1403, 10 L.Ed.2d 462 (1963) (Brennan, J., dissenting) (electronic surveillance devices "lend themselves to diabolical fakery"); S. DASH, R. SCHWARTZ & R. KNOWLTON, THE EAVESDROPPERS 367–71 (1959).

**61.** *See* STANDARDS RELATING TO ELECTRONIC SURVEILLANCE § 5.14 commentary at 160 (Tent.Draft 1968).

tapes have been altered relevant to the assessment of the adequacy of the Government's explanation for its delay, *see United States v. McGrath*, 622 F.2d 36, 42 (2d Cir. 1980); *United States v. Diana*, 605 F.2d 1307, 1314 (4th Cir.1979), *cert. denied*, 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980), we reject any suggestion that it is incumbent upon the potentially aggrieved persons to present evidence constituting a colorable challenge to the integrity of the tapes. Rather, we hold that, in most cases, evidence from which the court can infer that the tapes were held in such a condition as to ensure that they could not be tampered with will be an important component of the Government's "satisfactory explanation." If the Government cannot present such evidence, its explanation will be highly suspect.

█ Here, the record reveals,[62] and the appellants have conceded, that the tapes were placed in a police vault in a condition that guaranteed their integrity. This, coupled with the brevity of the delay and the fact that Judge Penn's unavailability frustrated the Government's efforts to obtain a judicial seal,[63] leads us to accept the District Court's conclusion that the delay was satisfactorily explained.

5. *Use of Intercepted Communications to Secure Convictions for Federal Offenses*

Because Judge Green authorized the wiretap to secure evidence concerning heroin and cocaine trafficking in violation of the D.C.Code and its fruits were eventually used to secure federal convictions for trafficking in a nonnarcotic drug, the appellants maintain that the Government violated the D.C.Code's "other crimes" provision, D.C.Code Ann. § 23–548(b) (1981), which requires judicial authorization for the disclosure and use of intercepted communications "relating ... to offenses other than those specified in the order of authorization." Even if the crimes for which the appellants were convicted were ones for which section 548(b) required separate judicial authorization,[64] a conclusion that we need not reach to decide this case, we would not suppress the intercepted communications.

█ The affidavit accompanying the July Application clearly informed Judge Green of the interception of evidence relating to the offenses for which the appellants were prosecuted.[65] This, combined with the Government's clear statement of its intention to seek federal indictments[66] and the fact that *the crimes under consideration are very similar,* satisfied section 548(b) under the implicit authorization rule adopted by a number of courts interpreting 18 U.S.C. § 2517(5) (1976), Title III's "other offense" provision. Under that rule, "the disclosure in subsequent affidavits to the issuing judge of material facts constituting or clearly relating to other offenses" satisfies the Government's obligation to seek judicial authorization for the disclosure and use of evidence inadvertently intercepted.[67]

We note also our uncertainty as to whether suppression would be appropriate if we concluded that the Government had technically violated section 548(b). That section was designed, like its federal counterpart, to deter abuse of wiretapping procedures by guaranteeing that "the original order was lawfully obtained, that it was sought in good faith and not merely as a subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed

---

**62.** Tr. 17–18.

**63.** *See* Tr. 17–22, 26–27.

**64.** *See United States v. Campagnuolo,* 556 F.2d 1209, 1213–15 (5th Cir.1977); *United States v. Brodson,* 528 F.2d 214, 215–16 (7th Cir.1975).

**65.** July Application, App. 114–15.

**66.** *See* June Application, App. 80 n. 2; July Application, App. 110 n. 2.

**67.** *United States v. Masciarelli,* 558 F.2d 1064, 1068 (2d Cir.1977); *e.g., United States v. Marion,* 535 F.2d 697, 703 (2d Cir.1976); *United States v. Tortorello,* 480 F.2d 764, 782–83 (2d Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973).

order." [68]  Because we perceive no reason why the Government would disguise a search for evidence of Preludin distribution as a search for evidence of trafficking in heroin and cocaine, we would conclude that the purposes of section 548(b) were satisfied and that suppression would not be required under the standards we deem appropriate. *See* Part II.A. *supra.*

### 6. *Failure to File Annual Reports*

█ The appellants' final allegation—that the Government's failure to file the annual reports specified by D.C.Code Ann. § 23–555(b) (1981) requires suppression—is groundless. It does not clearly appear from the record that the United States Attorney failed to file a required report, and, in any event, suppression of the fruits of electronic surveillance would be an inappropriate remedy for a violation of this noncentral provision.[69]

### III. CONCLUSION

Because the procedures followed by the Government here were deficient in several respects, we take this opportunity to remind it that "strict adherence . . . to the provisions of . . . [the wiretapping statute] would . . . be more in keeping with the responsibilities Congress has imposed upon it when authority to engage in wiretapping or electronic surveillance is sought." *United States v. Chavez,* 416 U.S. 562, 580, 94 S.Ct. 1849, 1858, 40 L.Ed.2d 380 (1974). For the reasons set forth above, however, we hold that the District Court did not err in denying the appellants' motion to suppress. Accordingly, their convictions are

*Affirmed.*

MIKVA, Circuit Judge, dissenting in part:

The provisions of the D.C.Code governing the use of electronic surveillance in the District of Columbia, D.C.Code Ann. §§ 23–541 to –546 (1981), were enacted by Congress just two years after passage of the Omnibus Crime Control and Safe Streets Act of 1968, Title III of which governs the use of electronic surveillance at the federal level nationwide, 18 U.S.C. §§ 2510–2520 (1976 & Supp. V 1981). Both statutes prohibit the interception, disclosure, and use of wire or oral communications not specifically sanctioned by statute. Both statutes also require that applications for wiretaps be authorized by certain high-level officials before they are submitted for court approval. Under the national law—Title III—the application must be authorized by "[t]he Attorney General, or any Assistant Attorney General specially designated by the Attorney General." *Id.* § 2516(1); *see also United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). Under the D.C. law, however, only "[t]he United States attorney may authorize, *in writing,* any investigative or law enforcement officer to make application to a court for an order authorizing the interception of wire or oral communications." D.C.Code Ann. § 23–546(a) (1981) (emphasis added). I cannot join my colleagues in ignoring the writing requirement that the D.C. statute imposes. The plain language utilized by Congress precludes such a result, however tempting it is to dismiss concerns about deviations from the statute in this case. Thus, I conclude that the applications for both the original wiretap and the thirty-day extension were not properly authorized; that the telephone conversations overheard during those wiretaps were "unlawfully intercepted" within the meaning of D.C.Code § 23–551(b)(1); and that the contents of those conversations, and all the evidence derived therefrom, must be suppressed. Although I agree with the majority on each of

**68.** S.Rep. No. 1097, *supra* note 32, at 100, 1968 U.S.Code Cong. & Ad.News at 2189; *accord United States v. Vento,* 533 F.2d 838, 855 (3d Cir. 1976).

**69.** *Cf. United States v. Kohne,* 358 F.Supp. 1053, 1057 (W.D.Pa.) (failure to comply with Title III's annual reporting requirement not grounds for suppression), *aff'd,* 487 F.2d 1395 (3d Cir.1973), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2624, 41 L.Ed.2d 224 (1974). *See generally* S.Rep. No. 538, *supra* note 26, at 24–25 (D.C. Code's annual reporting requirements designed to facilitate public evaluation and evaluation by other branches of government).

the other issues raised by the appellants, my separate conclusions would require that all of the appellants' convictions be vacated and remanded to the district court for new trials excluding the tainted evidence.

The Government admits, as it must, that the United States attorney never provided written authorization for either of the disputed wiretaps, thus failing to satisfy the statutory requirements imposed by section 546(a). The question for the court is simply whether such a violation of the statute requires that the resulting evidence be suppressed under section 551(b)(1).

Under prior Supreme Court interpretations of identical language in Title III, suppression is required when the Government "fail[s] to satisfy any of those requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *Giordano,* 416 U.S. at 527, 94 S.Ct. at 1832, *quoted in United States v. Donovan,* 429 U.S. 413, 433–34, 97 S.Ct. 658, 671, 50 L.Ed.2d 652 (1977); *United States v. Chavez,* 416 U.S. 562, 575, 94 S.Ct. 1849, 1856, 40 L.Ed.2d 380 (1974). It also has been authoritatively decided that "the provision for pre-application approval was intended to play a central role in the statutory scheme and that suppression must follow when it is shown that this statutory requirement has been ignored." *Giordano,* 416 U.S. at 528, 94 S.Ct. at 1832; *see Chavez,* 416 U.S. at 571, 94 S.Ct. at 1854 ("Congress . . . made preliminary approval of submission of wiretap applications a central safeguard in preventing abuse of this means of investigative surveillance"); *see also* Majority opinion at 122.

The written authorization is an integral part of the approval process that serves as a prerequisite to any wiretap application under the D.C.Code. Unless a writing is executed by the United States attorney, the application is not authorized. Any other interpretation ignores the plain language of the statute, and as Justice Holmes noted in *Roschen v. Ward,* 279 U.S. 337, 339, 49 S.Ct.

336, 73 L.Ed. 722 (1929), "there is no canon against using common sense in construing laws as saying what they obviously mean." Moreover, the language of section 546(a) should be contrasted with the wording of Title III, a statute that is *in pari materia* with the wiretapping provisions of the D.C. Code. *See* 2A J. SUTHERLAND, STATUTES AND STATUTORY CONSTRUCTION §§ 51.02–.03 (C. Sands 4th ed. 1973); *see also Erlenbaugh v. United States,* 409 U.S. 239, 243–44, 93 S.Ct. 477, 480, 34 L.Ed.2d 446 (1972). To the extent that the statutes differ, those differences simply cannot be ignored by a court that undertakes to interpret either statute consistently with the language chosen by Congress. The writing requirement must be given effect. Finally, this court has previously recognized that some of the D.C. Code's wiretapping "provisions are, in fact, stricter than the corresponding sections of the federal statute." *United States v. Johnson,* 539 F.2d 181, 188 (D.C.Cir.1976), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977); *see* S.Rep. No. 538, 91st Cong., 1st Sess. 18 (1969) (the D.C.Code does "not necessarily adopt outright or substantially verbatim the language of the procedural sections of the Federal act," but rather "resolve[s] occasionally that which is unclear or ambiguous"). When such situations are presented, the stricter provisions of the D.C.Code must be applied.

The majority admits that fidelity to Congress' literal language is especially important when interpreting a statute that Congress drafted " 'with exacting precision.' " Majority opinion at 120 (quoting *Donovan,* 429 U.S. at 441, 97 S.Ct. at 674 (Burger, C.J., concurring)). Yet from silence in the legislative history, and from a concession by appellants' counsel during oral argument that the United States attorney verbally authorized the applications in question, the majority decides first to separate the writing requirement from the remainder of the authorization process and then to ignore it completely. However well-intentioned the majority's attempt to excuse the Government's failures, it cannot do so without restructuring the statute's plain language.

Equally unavailing is any attempt to compensate for the lack of written authorization by the official designated in the D.C. statute by relying on written approval from an Assistant Attorney General of the United States. Although such officials may be specially designated to authorize wiretap applications under Title III, Congress has given them no authority over wiretaps sanctioned by the D.C.Code. Rather, the local statute allows *only* the United States attorney, defined to include "the United States attorney for the District of Columbia or any of his assistants designated ... to act in his place for the particular purpose in question," D.C.Code Ann. § 23–541(11) (1981), to provide written authorization for wiretap applications.

The majority does make a plausible argument that requiring the United States attorney's authorization to be in writing is not necessary to further the procedural goals of the statute. But that is a policy decision already made by the legislature. Congress has imposed a writing requirement; it is not for the court to amend that out of the statute because it seems too meticulous.

In sum, the D.C.Code provision violated by the Government in these cases goes to the heart of the reviewing and approval functions of the statutory scheme. Without a writing, there can be no authorization from the United States attorney. Neither the oral authorization of the United States attorney nor the written approval of any Assistant Attorney General can substitute for the plain language chosen by Congress. That the appellants will be the beneficiaries of a technicality in the law is the necessary result of interpreting a technical statute the way Congress wrote it. I respectfully dissent.