**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**George LAWSON and Ronald Scharf,
Defendants-Appellants.**

**Nos. 74–1982, 74–1996.**

United States Court of Appeals,
Seventh Circuit.

Argued June 2, 1975.*

Decided Aug. 20, 1975.

---

* This appeal was originally decided by unreported order on August 20, 1975. See Circuit Rule 35. The panel has subsequently decided to issue the decision as an opinion.

Carl M. Walsh, Edward M. Genson, Chicago, Ill., for defendants-appellants.

Samuel K. Skinner, U. S. Atty., Jerome C. Randolph, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, MOORE, Senior Circuit Judge,** and PELL, Circuit Judge.

MOORE, Senior Circuit Judge.

George Lawson and Ronald Scharf appeal from judgments of conviction following a

---

** Senior Circuit Judge Leonard P. Moore of the United States Court of Appeals for the Second Circuit is sitting by designation.

jury trial before Judge Bernard Decker, Northern District of Illinois, on a one count indictment charging Lawson and Scharf as well as Bobbie Arnstein and George Matthews with conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Matthews pleaded guilty and testified for the government at the joint trial of Lawson, Arnstein[1] and Scharf. Lawson and Scharf raise a plethora of issues on appeal including lack of speedy trial; a bar to prosecution from a prior dismissal of an indictment with prejudice; defective indictment due to reference to cocaine rather than coca leaves; statutory misclassification of cocaine as a narcotic; improprieties in wiretap procedure requiring suppression; proof of multiple conspiracies rather than a single one; a double jeopardy problem in terms of a relationship between a prior conspiracy for which Lawson was convicted and the instant conspiracy; improper admission of "business records"; prejudicial conduct of trial judge; and the giving of a portion of the charge in Lawson's absence.

Although we do not discuss each issue below, we have considered each of the issues raised very carefully and we affirm the convictions.

The evidence at trial indicated that Lawson who was residing in Jamaica, B.W.I., acted as a go-between in getting Scharf, a potential Chicago purchaser-distributor of cocaine, into contact with Matthews who lived in Florida and had large quantities of cocaine for sale.

Lawson, a resident of Jamaica, sent his girlfriend to Matthews' Miami home in August 1971 to obtain cocaine and bring it to Jamaica. Lawson then telephoned Matthews and indicated that he knew several people in the United States who would be interested in purchasing cocaine. Matthews gave Lawson an unpublished phone number to be given to "Ronnie" from Chicago. Following a phone contact, Ronald Scharf and Ira Sapstein flew to Miami to see Matthews, where the three of them sampled cocaine. Scharf left for Chicago with an ounce and a half sample having given Matthews two phone numbers where he could be reached, one of them being a number for the Playboy Mansion. Scharf returned to Miami a few days later but no transaction occurred due to Scharf's financial inability. On September 10, 1971 Scharf visited Matthews, accompanied by Bobbie Arnstein, and in the course of the visit accepted a half-pound of cocaine. On September 13 an informant carrying $6,250 in government funds purchased some cocaine from Scharf, while drug enforcement agents watched, although they were unable to see the exchange of money for the white crystalline powder.

On September 14, Lawson phoned Matthews to inquire when he (Lawson) would be paid for the Scharf-Matthews transaction.

About a week later Matthews and his wife drove to Chicago where Matthews and Scharf discussed payment by Scharf to Matthews for the half-pound at the Arnstein apartment.

Scharf arranged a purchase with Matthews in November for the informant and an undercover agent. In the meantime, Scharf's phone had been tapped. Matthews was arrested when he attempted to complete a cocaine sale with the undercover agent.

Appellants have raised many issues involving the obtaining and processing of wiretap evidence and the conduct of the trial. Before discussing the claims based on governmental noncompliance with the provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 we will consider a few of appellants' arguments with respect to alleged faulty trial procedures.

## LACK OF SPEEDY TRIAL

Lawson and Scharf were both named in an indictment in this case in De-

---

1. Bobbie Arnstein died following the trial and the indictment against her was subsequently dismissed.

cember 1972 and they claim that they were deprived of their constitutional right to speedy trial by the twenty-two month pretrial delay from December 1972 to October 1974. The right of a defendant to a speedy trial is not absolute and exists in a balance with the right of the public to have offenders prosecuted. The Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) has indicated that where a delay has occurred a court must consider four factors—(1) the length of delay; (2) the reasons for delay; (3) defendant's requests for trial; and (4) whether or not defendant was prejudiced by the delay—to determine whether a defendant has been denied his constitutional right to speedy trial. In this case, considering these factors, we find that Lawson and Scharf did not suffer a deprivation of their constitutional speedy trial right.

Trial was originally scheduled for June 1973 but the government's chief witness, Matthews, disappeared before trial. In August 1973 Lawson filed a demand for immediate trial. In September 1973 due to Matthews' continuing unavailability, the government moved to dismiss the original indictment. Matthews was located in October 1973 and the second indictment was returned in March 1974. The case was set for trial for July 1974 but was continued until October 1974 because of the calendar situation for a trial of the length estimated by counsel.

In *Barker v. Wingo, supra,* reaffirmed in *Moore v. Arizona,* 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973), the Supreme Court indicated that we must examine and balance the above-mentioned factors. We, therefore, turn to the reasons for the delay. The initial delay in the summer of 1973 was the result of Matthews' unavailability. There has been no indication that the government did not make a good faith effort to locate the missing witness. *See also Barker v. Wingo,* 407 U.S. at 531, 92 S.Ct. 2182; *United States v. DeTienne,* 468 F.2d 151 (7th Cir. 1972), *cert. denied,* 410 U.S. 911, 93 S.Ct. 974, 35 L.Ed.2d 274 (1973). Once Matthews was located in October he gave further information necessitating additional investigation by the government. This resulted in another delay before the new indictment of March 1974 was returned.

From that point until July 1974 various pretrial motions occupied the attention of defense counsel, the government, and the court. During a colloquy about scheduling on July 16, 1974, Judge Decker informed counsel that he would be attending a judicial administration conference on July 27. Defense counsel indicated that they did not believe the trial could be completed by then. Since counsel for Arnstein was unavailable in August and Judge Decker had another lengthy trial scheduled in September, trial was set for October 21, 1974. Based upon the record in this case, we find that the defendants were not deprived of a speedy trial.

## DOUBLE JEOPARDY

■ Lawson claims that his conviction in this case violates the constitutional protection against double jeopardy due to an alleged relationship between the instant conspiracy and the conspiracy charged in *United States v. Lawson,* 507 F.2d 433 (7th Cir. 1974). An examination of the facts of the earlier case reveals that the two conspiracies were different and prosecution for each is entirely proper. While there are some similarities between the two conspiracies, the parties involved, the mode of distribution, and Lawson's role were different in each and his double jeopardy claim must fail. *See United States v. Barzie,* 433 F.2d 984 (2d Cir. 1970), *cert. denied,* 401 U.S. 975, 91 S.Ct. 1194, 28 L.Ed.2d 324 (1971). *Cf. Dryden v. United States,* 403 F.2d 1008, 1009 (5th Cir. 1968); *United States v. Edwards,* 366 F.2d 853, 872 (2d Cir. 1966), *cert. denied,* 386 U.S. 919, 87 S.Ct. 882, 17 L.Ed.2d 790 (1967).

## THE WIRETAP EVIDENCE

Congress has specified the procedure for securing judicial authority to intercept wire communications in the investigation of certain serious offenses in Title III of the

Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520. 18 U.S.C. § 2516(1) provides that the Attorney General or a specially designated Assistant Attorney General must authorize every wiretap application submitted for approval to the district court.[2] The district court must make certain findings before authorizing interceptions including (1) the lack of other investigative techniques and (2) the existence of probable cause.[3] The law enforcement agency is required to produce the tapes to the authorizing judge for sealing once the order expires and the statute provides for official control of the custody of any recordings or tapes until the time of trial.[4] Notification to those subject to the surveillance is required prior to use of the tap evidence at trial.[5] Suppression of evidence derived from electronic surveillance is required by the statute when communication has been unlawfully intercepted or when approval of the wiretap order is insufficient on its face.[6]

2. 18 U.S.C. § 2516(1) provides:

The Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for . . . an order authorizing or approving the interception of wire or oral communications.

3. 18 U.S.C. §§ 2518(1)(b) and (c) provide:

(1) Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:

\*  \*  \*  \*  \*  \*

(b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous; . . .

18 U.S.C. §§ 2518(3)(a), (b), (c) and (d) provide:

(3) Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire or oral communications within the territorial jurisdiction of the court in which the judge is sitting, if the judge determines on the basis of the facts submitted by the applicant that—

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

4. 18 U.S.C. § 2518(8)(a) provides:

. . . Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recordings shall be wherever the judge orders. . . .

5. 18 U.S.C. § 2518(8)(d) provides:

(d) Within a reasonable time but not later than ninety days after the filing of an application for an order of approval under section 2518(7)(b) which is denied or the termination of the period of an order or extensions thereof, the issuing or denying judge shall cause to be served, on the persons named in the order or the application, and such other parties to intercepted communications as the judge may determine in his discretion that is in the interest of justice, an inventory which shall include notice of—

(1) the fact of the entry of the order or the application;

(2) the date of the entry and the period of authorized, approved or disapproved interception, or the denial of the application; and

(3) the fact that during the period wire or oral communications were or were not intercepted. . . .

6. Evidence obtained in violation of Title III may not be used according to 18 U.S.C. § 2515 which provides:

Whenever any wire or oral communication has been intercepted, no part of the contents

Appellants moved to suppress the wiretap evidence prior to and at trial, alleging violations of all of the provisions referred to above. The trial judge denied the suppression motions and admitted the evidence. We must determine whether the government failures to comply with statutory provisions are of the type which " . . . require suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States v. Giordano,* 416 U.S. 505 at 527, 94 S.Ct. 1820, at 1832, 40 L.Ed.2d 341 (1974).

■ Appellants have raised the question of whether wiretap authorizations signed by an acting Assistant Attorney General, not specially authorized to approve electronic surveillance under 18 U.S.C. § 2516(1), must be suppressed as facially insufficient under 18 U.S.C. § 2518(10)(a) (ii). *See* notes 2 and 6 *supra.*

We are not dealing with a claim that the wiretap application *was not authorized* by the Attorney General or an Assistant Attorney General because the defendants have not contested government affidavits indicating that Attorney General John Mitchell himself *authorized* the surveillance. Rather, the attack is on the facial sufficiency of the affidavit because the authorization order *was signed* by Acting Assistant Attorney General Henry Petersen. The order was signed by Petersen in November 1971 approximately two months prior to Senate confirmation of his appointment. We agree with the holding of the Third Circuit in *United States of America v. Acon,* 513 F.2d 513, decided March 6, 1975 where under similar factual circumstances the court found the facial insufficiency of an authorization order signed by Acting Assistant Attorney General Petersen where the Attorney General himself had approved the application too technical to require suppression. *See United States v. Chavez,* 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974). *See also United States v. Robertson,* 504 F.2d 289 (5th Cir. 1974); *United States v. Boone,* 348 F.Supp. 168 (E.D.Va., 1972) *aff'd mem.,* 499 F.2d 551 (4th Cir. 1974). In *Chavez* the Supreme Court distinguished the requirement of a properly authorized order from the requirement of identifying the authorizing official.[7] Because the latter requirement was merely designed to fix responsibility, it does not establish a substantive role and as a technical violation does not require suppression. We do not suggest that the government is free to pick and choose which technical requirements to comply with and which to flout; rather we believe that the government should in the future comply with all the requirements which Congress set up for use of such an unusual investigative technique. We merely find that the drastic remedy of suppression is not required where this technical violation occurs and the general purpose of the statute has been preserved. In this

---

of such communication and no evidence derived therefrom may be received in evidence in any trial . . . if the disclosure of that information would be in violation of this chapter.

Suppression sanctions for improperly intercepted communications are included in 18 U.S.C. § 2518(10)(a):

(10)(a) Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that—

(i) the communication was unlawfully intercepted;

(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval. [Not relevant here.]

7. Compare note 2 with § 2518(4)(d) which provides as follows:

(4) Each order authorizing or approving the interception of any wire or oral communication shall specify—

 *    *    *    *    *    *

(d) the identity of the agency authorized to intercept the communications, and of the person authorizing the application; . . .

instance the purpose of the statute was carried out inasmuch as the Attorney General himself authorized the order in fact.

██ Appellants also challenge the sufficiency of the order's underlying affidavit as to probable cause. *See* note 3 *supra.* We agree with the conclusion of Chief Judge Robson, who ordered the wiretap, that there was probable cause to believe that defendants' drug-related conversations would be intercepted through surveillance of the named telephone.

Chief Judge Robson issued the wiretap order, covering two telephones listed in the name of Scharf's roommate Ira Sapstein, on November 11, 1971 for a fifteen day period expiring November 26, 1971. At the time he had before him a wiretap authorization letter of Acting Assistant Attorney General Petersen, an application for wiretap authorization order signed by a Special Assistant United States Attorney, and an affidavit in support of that application given by Agent Aurilio, one of the agents of the Bureau of Narcotics and Dangerous Drugs who had been engaged in surveillance and undercover work on this case.

Aurilio's affidavit set out detailed information garnered from a reliable informant and corroborated by BNDD agents' surveillance and independent investigation. This informant was introduced to Scharf in early September 1971 by a mutual acquaintance for the purpose of obtaining cocaine. According to the agent's affidavit, Scharf told the informant that he could supply unlimited cocaine and he gave Scharf a sample. A week later the informant purchased a half-pound of cocaine from Scharf in a transaction funded and surveilled by BNDD agents who were unable to see the actual transfer. At this time, a telephone relationship between Scharf and the informant was established, and, in response to a suggestion of the informant, Scharf refused to meet the informant's boss. Between September 15 and October 15, Scharf and the informant maintained telephone contact, on one of Sapstein's phones, involving a pending sale of narcotics which included an extra measure to make up for the poorer quality of the

first transaction as compared with the sample. Scharf told the informant that his source was a man named George in Jamaica. BNDD agents checked the phone records and learned that 23 calls were made from the Sapstein phone to a George Lawson in Jamaica. The informant also told the agents that Scharf was reorganizing his business after November 2, 1971 and later he gave to agents the two new non-published numbers which had been installed at the Scharf-Sapstein apartment and which were provided to him by Scharf. We believe that a reasonable man would conclude that Scharf was using the two non-published numbers to arrange for the importation and distribution of cocaine. *See United States v. James,* 161 U.S.App.D.C. 88, 494 F.2d 1007, 1015 (1974) for a probable cause finding based on a similar fact pattern.

██ Appellants also argue that suppression was required because of deficiencies with respect to the requirements of §§ 2518(1)(c) and (3)(c) of a statement in the affidavit and a determination by the Court that other investigative procedures are unavailable. As the Supreme Court noted in *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983, 39 L.Ed.2d 225 (1974) these requirements are "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." In this instance it was clear from the agent's affidavit that other investigatory techniques were inadequate inasmuch as surveillance had not been totally successful and since Scharf had exhibited such reluctance to meet with the informer's boss. Furthermore, in view of the fact that Scharf's source was in Jamaica, wiretapping was the only feasible means suitable to determine delivery techniques, times, and places. *See United States v. James, supra.* We hold that the judge had an adequate basis on which to determine the unavailability of other investigative procedures and that he was able to make that determination.

Finally, appellants challenge the government's compliance with statutory provisions

involved in four aspects of post-wiretap procedures: (1) the tapes were not "immediately" sealed; (2) they were sealed under the directions of Judge Austin rather than Chief Judge Robson who had granted the authorization order; (3) some of the seals affixed in Judge Austin's presence were broken prior to trial; and (4) delay in providing an inventory of the tapes to Scharf and failure to provide an inventory to Lawson, the other party named in the wiretap warrant.

■ The government has suggested that the post-interception sealing violations by their nature might not be cognizable under the 18 U.S.C. § 2518(10)(a)(i) suppression section. See note 6, *supra.* We do not agree and we hold that the post-interception violations must also be scrutinized to determine if the failures to satisfy the statutory requirements directly and substantially affect the Congressional intention to limit the use of intercept procedures and to comply with Fourth Amendment principles. The Ninth Circuit in *United States v. Chun,* 503 F.2d 533 (9th Cir. 1974) advocated a three-step test to determine whether or not § 2518(10)(a)(i) requires suppression for a post-interception failure to comply with statutory requirements:

1. whether the particular procedure is a central or functional safeguard in Title III's scheme to prevent abuses;
2. whether the purpose which the particular procedure was designed to accomplish has been satisfied in spite of the error;
3. whether the statutory requirement was deliberately ignored; and, if so, whether there was any tactical advantage to be gained thereby.

*See also United States v. Falcone,* 505 F.2d 478 (3d Cir. 1974).

■ We believe that the function of the post-interception procedural requirements is to preserve the integrity of the intercepted conversations and to prevent any tampering or editing of the tapes or other unlawful use. While the substantive pre-order requirements are central to the Congressional purpose of limiting the use of wiretapping as an investigative technique, the post-interception integrity measures are also important.

■ As to appellants' claim that suppression was mandated because the tapes were presented to a different judge than the judge who signed the wiretap order, we find that this is a frivolous argument. The purpose to be served by judicial sealing was accomplished and was no less effective by virtue of the difference of judicial personnel.

■ We are troubled, however, by the delay of fifty-seven days from the expiration of the interception order to the presentation of the tapes to a judge for sealing. The statute requires that this presentation occur "immediately" and the difference between "immediately" and "fifty-seven days" is not insignificant.[8] We do not assign error to the failure to suppress the tap evidence on this ground because the appellants have not questioned the integrity of the tapes. The purpose of the statute, to insure the integrity of the tapes, thus, was accomplished. The record indicates that the agent had sealed the envelopes containing the tapes immediately after the interceptions and when the tapes were presented to the court the sealed envelopes were placed in boxes which were then sealed. The government has sought to excuse the delay by virtue of Agent Aurilio's travel on other assignments. We find this explanation somewhat untenable when juxtaposed to the government's argument that judges are fungible for purposes of sealing wiretap evidence and we again urge the government to comply with statutory wiretap requirements both pre-interception and post-interception to the fullest extent possible, rather than to continue its unenthusiastic approach for the "technical" requirements demonstrated in this particular case.

■ Appellants also complain of broken seals on the tape evidence when brought to trial. Again we believe suppression is un-

---

8. See also *United States v. Sklaroff,* 506 F.2d 837 (5th Cir. 1975).

warranted due to the absence of challenge to the integrity of the tapes. The broken seals occurred on the boxes while the seals on the envelopes which were secured by Agent Aurilio remained intact. Although we believe this deviation from the statutory requirement does not warrant suppression absent a challenge to the integrity of the evidence, or an allegation that the government acted deliberately to cause the breaking, the government's explanation that the seals were broken due to their proximity for some time to office air-conditioning-heating system vents is somewhat speculative.

█ The final post-interception question raised by appellants is the failure of the government to comply with the inventory provisions of Title III requiring the government to provide each of the appellants with a notice of a wiretap order within 90 days of the termination of the surveillance. *See* note 5, *supra.* The defendants did not receive the notice and inventory until April 1974, over two years after termination of the wiretap. While this is another example of the nonchalant and careless attitude of the government toward significant Congressionally mandated procedures, we believe that suppression is not required inasmuch as defendants received the inventory three months prior to the hearing on defendants' motion to suppress and furthermore appellants have not alleged any prejudice resulting from this noncompliance. *See United States v. Wolk,* 466 F.2d 1143 (8th Cir. 1972). *See also United States v. John,* 508 F.2d 1134, 1138–9 (8th Cir. 1975); *United States v. Manfredi,* 488 F.2d 588, 602 (2d Cir. 1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974); *United States v. Iannelli,* 477 F.2d 999, 1003 (3d Cir. 1973), *affirmed,* 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975).

We hold that the wiretap evidence was properly admitted at trial, that defendants were not deprived of the constitutional right to a speedy trial, and that Lawson's trial on this indictment did not subject him to double jeopardy. We affirm the convictions.

United States Court of Appeals,
Seventh Circuit.