**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 16 2003**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

JOHN WESLEY RADCLIFF,

      Defendant - Appellant.

No. 01-1557

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 99-CR-61-N)**

---

David B. Savitz, Denver, Colorado, for Defendant-Appellant.

Robert M. Russel, Assistant United States Attorney, Denver, Colorado (John W. Suthers, United States Attorney, with him on the briefs) for Plaintiff-Appellee.

---

Before **EBEL**, **ALDISERT**,[*] and **HOLLOWAY**, Circuit Judges.

---

**EBEL**, Circuit Judge.

      Defendant John Wesley Radcliff, undersheriff for Ouray County, Colorado, was convicted by a jury of conspiracy to distribute methamphetamine and of

---

[*] Honorable Ruggero J. Aldisert, Circuit Judge, U.S. Court of Appeals, Third Circuit, sitting by designation.

carrying a firearm during and in relation to that conspiracy. He was sentenced to 288 months of imprisonment.

Defendant now challenges three aspects of the proceedings before the district court. First, he contends that the evidence was not sufficient to support his firearm conviction. Second, Defendant contends that wiretap evidence used against him at trial should have been suppressed because of a defect in the order authorizing the wiretap. Third, Defendant contends that the district court erroneously declined to grant a downward departure based on his evidence of psychological coercion.

We exercise jurisdiction over this criminal appeal pursuant to 28 U.S.C. § 1291, AFFIRM Defendant's conviction, and DISMISS his sentencing challenge. The evidence at trial was sufficient to prove that Defendant carried a firearm during and in relation to the methamphetamine conspiracy. The district court correctly denied Defendant's motion to suppress the wiretap evidence because the omission in the wiretap order was merely a technical defect.

We do not have jurisdiction to review a district court's denial of a downward departure at sentencing, unless the district court mistakenly believed it had no authority to depart. Because the district court did not clearly indicate that it had no authority to depart, we DISMISS that portion of Defendant's appeal.

## I.    BACKGROUND

On March 25, 1999, Defendant was indicted along with eighteen others for conspiracy to possess with intent to distribute methamphetamine in violation of 18 U.S.C. § 846.  Defendant was also individually indicted for carrying a firearm—the Ruger .45 service weapon he carried in his capacity as undersheriff—during and in relation to the conspiracy in violation of 18 U.S.C. § 924(c).

The methamphetamine distribution conspiracy charged in this case began in 1996.  Its ringleader was Defendant's brother-in-law, Perry Wherley ("Wherley"). In 1994, Defendant married Wherley's sister, Lisa, who unbeknownst to Defendant was a long-time user of methamphetamine.  Lisa obtained methamphetamine from Wherley and from her aunt, co-defendant Brenda Paul ("Paul").

The conspiracy emerged when Wherley and Paul began traveling to California every other weekend to purchase methamphetamine and bring it back to Ouray County.  They would typically buy one to four ounces of methamphetamine and, upon their return, would prepare it for distribution to approximately ten regular customers.  Customers would come to Wherley's trailer to pick up their purchases.  Although Paul left the conspiracy in the summer of 1997, Wherley continued these trips to California with various partners and

obtained methamphetamine from various sources. During the conspiracy's infancy, Defendant discovered his wife's addiction and eventually became a user himself. They both continued to use methamphetamine until the 1999 indictment.

Defendant's role in the conspiracy was to warn Lisa and Wherley about law enforcement risks to the operation and to mislead other law enforcement officers regarding the illegal drug activity. Through numerous incidents from 1997 until the March 1999 indictment, Defendant demonstrated his willingness to interfere with law enforcement's investigation of the conspiracy.

In February 1997, Defendant received information from sheriff's deputy Dominic "Junior" Mattivi that a neighboring county was setting a roadblock for Wherley and Paul, who were returning from purchasing methamphetamine in California. Defendant relayed this information to Lisa and drove her to Paul's boyfriend's home. Paul's boyfriend drove to Utah to warn Wherley and Paul. Based on this warning, Wherley and Paul were able to avoid detection by law enforcement.

In June 1997, in order to cover up Defendant's knowledge of the conspiracy, Defendant and Lisa staged an act to convince another sheriff's deputy, co-defendant Leroy Todd, that Defendant was just discovering his wife's methamphetamine addiction. Also during that summer, Defendant learned that Paul was reporting Wherley's drug activities to the Colorado Bureau of

Investigation ("CBI"). This information was relayed through Lisa to Wherley, who went to the police and contradicted Paul's reports.

In January 1998, Wherley was stopped by a Colorado State Trooper, Shawn Olmstead. Olmstead discovered methamphetamine on Wherley and arrested him. When Olmstead radioed in the arrest information, he specifically requested that no one notify Defendant because he did not want any confrontations with Wherley's family members, especially family members that would be armed. Despite Olmstead's request, Defendant and Lisa arrived at the scene of the arrest just a few minutes later. From there, Lisa went to Wherley's trailer while Olmstead took Wherley to the police station and obtained a search warrant for the trailer. With Defendant's knowledge, Lisa took all of the inculpatory materials from Wherley's trailer and stored them in her house before the warrant was executed.

In February 1998, Wherley, while out driving, realized that he was being followed by Defendant's subordinate, Ouray County Sheriff's Deputy Betty Wolfe. Wherley called Defendant to ask why he was being followed. Defendant then phoned Wolfe and interrogated her as to why she was following Wherley. Intimidated by Defendant's questioning, Wolfe ceased to follow Wherley.

During the summer of 1998, Defendant, Lisa and Wherley became suspicious that their phone lines were under surveillance. They agreed to use a code when speaking about methamphetamine over the phone.

By November 1998, FBI Agent Emerson Buie had become involved in the investigation. Buie telephoned Defendant to see if Defendant would volunteer that Wherley was his brother-in-law. When Buie inquired about Wherley, Defendant did not mention their relationship and represented that Wherley had abandoned the drug business. That same month, CBI Agent Jack Haynes had the sheriff of a nearby town call Defendant and falsely advise him that a search was going to be executed at Wherley's trailer. Defendant told Lisa about this search but warned her that she could not tell Wherley. Lisa gave this information to her mother, who then called Wherley and warned him about the search.

Finally, throughout this time period, Defendant knowingly permitted Wherley to store methamphetamine and cash in his home for safekeeping when Wherley went out of town or feared his trailer would be searched.

Throughout the conspiracy, Wherley provided Defendant and Lisa with free, user amounts of methamphetamine. Typically he gave the methamphetamine to Lisa, who would share it with Defendant. To get methamphetamine from Wherley, Lisa and Defendant would ordinarily meet at Wherley's trailer shortly after he returned from his weekend trips to California. Lisa would arrive in her

car, and Defendant would arrive in his patrol car, wearing his uniform and carrying his gun. Wherley would give the methamphetamine to Lisa. Defendant would drive a short distance from the house, wait for Lisa to leave, and then escort her home.

The indictment alleged that on March 30, 1998, Defendant carried a firearm during and in relation to the drug trafficking conspiracy, shortly after Wherley had returned from a trip to California. On that date, law enforcement agents conducting surveillance testified that Defendant and Lisa arrived in separate cars at Wherley's trailer. After a short time, Defendant, who was in uniform, left in his patrol car, drove a few miles and pulled over to the shoulder of the road in front of a motel. Lisa Radcliff arrived at that location in her car five or ten minutes later. Both cars pulled out heading toward the Radcliffs' home.

On March 25, 1999, nineteen individuals were indicted in connection with this conspiracy. Eventually Wherley, Lisa, and other co-defendants cooperated and became government witnesses, while Defendant and six others proceeded to trial. Prior to trial, Defendant moved to suppress evidence that had been obtained from a wiretap in Wherley's house. This motion was denied.

The jury convicted Defendant on both the conspiracy and firearm charges. Defendant moved for a judgment of acquittal on the firearm conviction on the ground that there was insufficient evidence to show that he used his firearm "in

relation to" the drug trafficking conspiracy on March 30, 1998. The district court denied the motion.

Defendant was sentenced to 168 months of imprisonment on the conspiracy count and an additional 60 months on the firearm count. The district court denied his request for a downward departure pursuant to U.S. Sentencing Guideline § 5K2.12.

For the reasons stated below, we AFFIRM Defendant's conviction and DISMISS the portion of his appeal related to his sentence.

## II.   SUFFICIENCY OF THE EVIDENCE

Based on events that occurred on March 30, 1998, a jury convicted Defendant of using or carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). On appeal, Defendant argues that the evidence was insufficient to support the jury's finding that he carried his firearm "<u>in relation to</u>" the crime.[1] Because we find that a reasonable jury could infer that Defendant intended for his Ruger .45 service weapon to facilitate the conspiracy for the distribution of methamphetamine, we conclude

---

[1]Defendant preserved this issue for appeal by moving for a judgment of acquittal at the close of the Government's case and again at the close of all evidence.

that there was sufficient evidence that the firearm was carried "in relation to" the drug trafficking crime and AFFIRM his conviction.

We review the sufficiency of the evidence to support a jury's verdict de novo. United States v. McKissick, 204 F.3d 1282, 1289 (10th Cir. 2000). "[W]e ask only whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." Id. (internal quotations and citations omitted). We rely on the jury, as the fact finder, "to resolve conflicting testimony, weigh the evidence, and draw inferences from the facts presented." Id. at 1289-90.

18 U.S.C. § 924(c)(1) provides that "[w]hoever, during and in relation to any crime of violence or drug trafficking crime . . . , uses or carries a firearm, shall, in addition to the punishment provided for such crime . . . , be sentenced to imprisonment for five years . . . ."[2] Id. (emphasis added). On appeal, Defendant does not dispute that he carried a firearm during the commission of a drug

---

[2]This is the version of the statute that existed on March 30, 1998, the date of the crime charged. The statute was amended in November 1998 to impose enhanced sentences not only on those who used or carried firearms during drug felonies, but also on any person "who, in furtherance of any such crime, possesses a firearm." 18 U.S.C. § 924(c)(1)(A) (2000). "We do not consider the effects, if any, of the new language of § 924(c) because it did not become law until after [Defendant] committed the crimes with which he is charged." McKissick, 204 F.3d at 1292 n.2.

trafficking crime. Instead, he argues that the evidence was not sufficient to show that the firearm was carried "in relation to" the crime. He contends the firearm was coincidentally present as part of his sheriff's uniform.

In Smith v. United States, 508 U.S. 223 (1993), the Supreme Court held that the phrase "in relation to"

> is expansive. . . . [A]t a minimum, [it] clarifies that the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence. As one court has observed, the "in relation to" language "allay[s] explicitly the concern that a person could be" punished under § 924(c)(1) for committing a drug trafficking offense "while in possession of a firearm" even though the firearm's presence is coincidental or entirely "unrelated" to the crime. Instead, the gun at least must "facilitate, or have the potential of facilitating," the drug trafficking offense.

Id. at 237-38 (emphasis added) (citations omitted).

The Tenth Circuit has further articulated the circumstances under which a jury may find that a defendant has carried a weapon "during and in relation to" a drug trafficking crime. First, "our cases make clear that the 'during and in relation to' requirement of section 924(c) necessitates some direct connection between the firearm and the drug offense." United States v. Iiland, 254 F.3d 1264, 1274 (10th Cir. 2001) (emphasis added).[3] To establish this connection, the

---

[3]Iiland was primarily concerned with interpreting the language added to § 924(c)(1) in the 1998 amendments. That language provides punishment for anyone who possesses a firearm "in furtherance of" a drug trafficking crime. In order to interpret the phrase "in furtherance of," the Iiland court conducted a

(continued...)

Tenth Circuit requires evidence that the defendant <u>intended</u> that the firearm be used in the offense. <u>United States v. Shuler</u>, 181 F.3d 1188, 1190 (10th Cir. 1999) (citing <u>United States v. Richardson</u>, 86 F.3d 1537, 1548 (10th Cir. 1996) (quoting <u>United States v. Nicholson</u>, 983 F.2d 983, 990 (10th Cir. 1993))); <u>United States v. Matthews</u>, 942 F.2d 779, 783 (10th Cir. 1991) (citing S. Rep. No. 225, 98th Cong., 1st Sess. 1, 314 n. 10 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3492 n.10).[4]  There is no requirement, however, that the drug trafficking crime be the sole reason for the possession of the gun. <u>McKissick</u>, 204 F.3d at 1293-94.

Although we have often considered whether a case presents sufficient evidence to show that a defendant carried a firearm "in relation to" a drug

---

[3](...continued)
lengthy analysis of our interpretation of the phrase "during and in relation to." 254 F.3d at 1272-74.

[4]Occasionally we have stated that an appellate court on review may "presume[] a nexus between a firearm and a drug trafficking offense when an individual with ready access to a firearm commits such an offense," <u>McKissick</u>, 204 F.3d at 1293; <u>Richardson</u>, 86 F.3d at 1548; <u>Nicholson</u>, 983 F.2d at 990, and that "a defendant can overcome this presumption by presenting evidence that the weapon was present for a reason other than facilitating the drug transaction," <u>Richardson</u>, 86 F.3d at 1548; <u>Nicholson</u>, 983 F.2d at 990.  Nevertheless, in an en banc footnote in <u>United States v. Baker</u>, 30 F.3d 1278, 1280 n.1 (10th Cir. 1994), we explained that this presumption was merely a tool used to review the sufficiency of the evidence on appeal, utilizing the normal inferences applicable to review fact issues on appeal, and that it "in no way change[d] the government's burden at trial to prove every element of a § 924(c)(1) offense." <u>Id.</u>

Because the "presumption" language does not change our normal review process, we do not employ it here.

trafficking offense, we have never faced the specific issue presented here—whether a defendant, who carries a firearm as part of his law enforcement uniform and commits a crime while so attired, carries the firearm "in relation to" that crime. We find that the evidence in this case was sufficient to support a jury finding that Defendant intended to use his weapon to facilitate the methamphetamine conspiracy.

One recognized theory that explains how a gun facilitates a drug trafficking crime is that the gun deters interference with the crime. See United States v. Roberts, 14 F.3d 502, 518 (10th Cir. 1993); Nicholson, 983 F.2d at 990. In this case, the facts support the inference that Defendant intended that his weapon deter interference with his wife's transport of the methamphetamine.

First, the evidence demonstrated Defendant's willingness to interfere with law enforcement efforts targeting the drug operation. It also showed that other law enforcement agents knew of Defendant's willingness to interfere with law enforcement activity. Law enforcement agents Mattivi, Wolfe, Buie, Haynes and Olmstead had each experienced Defendant's disruptions of their investigations of Wherley. Trooper Olmstead even testified that when he arrested Wherley he did not want Defendant to be notified because he "did not want any further confrontations, especially with family members, especially with family members that could be armed." Escorting his wife's transport of the drugs while in

- 12 -

uniform advertised to others that Defendant was carrying his gun. Because other police officers would know about the gun, they would be deterred from interfering with this escort.

Second, the suspicious manner in which Defendant left Wherley's house on March 30, 1998, supports the inference that Defendant desired that his gun deter interference with Lisa's transport of the methamphetamine. Instead of riding with Lisa or driving his personal vehicle, Defendant advertised the presence of his gun by leaving Wherley's while wearing his uniform and driving his patrol vehicle. He then waited on the side of the road as though performing his law enforcement duties, once again advertising his status as a police officer and the presence of his gun. Only then did he escort his wife home, protecting her transport of the methamphetamine. Anyone following Lisa and intending to interfere with her transport of the drugs—whether they were police officers attempting to apprehend her or other criminals desiring to steal the drugs—would naturally be reluctant to do so in the presence of her armed protector. From Defendant's contrived behavior on March 30, 1998, a jury could infer that Defendant knew about and intended this effect.

We recognize that there is evidence in the record cutting the other way. Nevertheless, we conclude that a reasonable jury could find that Defendant carried his firearm to facilitate the transport of the methamphetamine. The jury

was the judge of the testimony of Lisa Radcliff and Perry Wherley and could easily have disregarded as biased their assertions that Defendant's possession of a gun was only incidental to the distribution of methamphetamine. The jury heard multiple witnesses testify about the drug conspiracy and about the activities that Defendant undertook to interfere with the police's ability to bust this conspiracy. Knowing that Defendant would undertake these activities and knowing of his loyalty to his wife and her family, the jury could infer that he intended for his firearm to serve as a deterrent to other police officers' interference with Lisa Radcliff's transport of methamphetamine, thus facilitating the conspiracy. Defendant's conviction is therefore affirmed.

## III.    MOTION TO SUPPRESS

Some of the evidence against Defendant was obtained via a wiretap in Perry Wherley's house. The wiretap was authorized pursuant to an original application, and then twice extended by additional applications. Prior to trial, Defendant moved to suppress this evidence because the wiretap orders failed to name the Department of Justice officials who had authorized the wiretap applications. Although we find that this failure rendered the orders facially insufficient under 18 U.S.C. § 2518(10)(a)(ii), we AFFIRM the district court's denial of

Defendant's motion to suppress because this failure constituted a technical defect that did not undermine the purposes of the statute or prejudice Defendant.

A wiretap authorization order is presumed valid, and the defendant bears the burden of proof to show otherwise. United States v. Mitchell, 274 F.3d 1307, 1309 (10th Cir. 2001). On appeal from a motion to suppress evidence obtained pursuant to a wiretap, this court reviews questions of law de novo. Id.

The use of wiretaps and evidence obtained therefrom is governed by Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"). 18 U.S.C. §§ 2510 et seq. To obtain a wiretap authorization order, a law enforcement agent must file an application with a judge of competent jurisdiction. Id. § 2518(1). That application must be authorized by one of the Department of Justice officials designated in § 2516(1),[5] and the order issued pursuant to the application must specify the identity of that authorizing official. Id. §§ 2518(1)(a), (4)(d).

---

[5]18 U.S.C. § 2516(1) permits the following officers to authorize a wiretap application:

> The Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General, any acting Assistant Attorney General, or any Deputy Assistant Attorney General or acting Deputy Assistant Attorney General in the Criminal Division specially designated by the Attorney General . . . .

- 15 -

Section 2518(10)(a) permits a defendant to move for suppression of evidence obtained through a wiretap on three grounds:

(i)    the communication was unlawfully intercepted;

(ii)    the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii)    the interception was not made in conformity with the order of authorization or approval.

Relying only on the second ground, Defendant contends that the orders of authorization in this case were insufficient on their face because they failed to specify the identity of the person or persons authorizing the applications as required by § 2518(4)(d).

In this case, each wiretap application was presented to federal district court judge John L. Kane, Jr., who granted the wiretap authorization orders. The first application was authorized in fact by Mary Lee Warren, Deputy Assistant Attorney General, Criminal Division. The first extension application was authorized in fact by Kevin V. DiGregory, Deputy Assistant Attorney General, Criminal Division. The second extension application was also authorized in fact by Mary Lee Warren.

There is no dispute that each of the applications was authorized by an appropriate individual within the Department of Justice, as required by § 2516(1). There is also no dispute that Mary Lee Warren and Kevin V. DiGregory were identified by name in the respective wiretap applications. However, instead of

- 16 -

specifying the names of Mary Lee Warren or Kevin V. DiGregory in the wiretap orders, each of the wiretap orders merely stated that the applications were:

> authorized by Attorney General Janet Reno who delegated her authority to an Assistant or Acting Assistant Attorney General in charge of the Criminal Division or any Deputy or Acting Deputy Assistant Attorney General of the Criminal Division, of the United States Department of Justice, pursuant to the power delegated to that official by special designation of the Attorney General and vested in the Attorney General by Section 2516 of Title 18, United States Code . . . .[6]

Despite this ambiguous language, however, Defendant knew from the time he learned of his indictment that Mary Lee Warren and Kevin V. DiGregory were the Department of Justice officials who had authorized the wiretap applications because he was provided at that time with copies of both the wiretap applications and the wiretap orders.[7]

In United States v. Chavez, 416 U.S. 562 (1974), and United States v. Giordano, 416 U.S. 505 (1974), the Supreme Court considered motions to suppress under § 2518(10)(a). Chavez, 416 U.S. at 573-75; Giordano, 416 U.S. at 512-23. In Chavez, the Supreme Court reviewed an order that named Acting Assistant Attorney General Will Wilson as the authorizing official, although the order had actually been authorized by the Attorney General. Id. at 573-74. The

---

[6]This language largely tracks the language of 18 U.S.C. § 2516(1), which prescribes which officials may authorize a wiretap application.

[7]Defendant conceded this at oral argument.

defendant argued first that the order was facially insufficient under § 2518(10)(a)(ii) and second that it was unlawful under § 2518(10)(a)(i).

With respect to the defendant's first argument—that the order was facially insufficient under § 2518(10)(a)(ii)—the Court held that because Will Wilson was a person legally empowered to authorize the application pursuant to § 2516(1), the order was facially sufficient, despite the fact that Wilson did not actually authorize the application. Chavez, 416 U.S. at 573-74. It concluded that an order is facially sufficient as long as it names "an authorizing official who possessed statutory power to approve the making of the application." Id. at 574.

This case, however, is distinguishable from Chavez. Section 2518(4)(d) requires that a wiretap order specify the identity of the person authorizing the application.[8] The orders in this case did not specify the identity of any person. Instead, they listed by title every Department of Justice official with legal authority to authorize an application. This general language fails to specify the identity of any person at all—anyone holding any title identified in the wiretap

---

[8]18 U.S.C. § 2518(4)(d) states:

Each order authorizing or approving the interception of any wire, oral, or electronic communication under this chapter shall specify—
. . .

(d)  the identity of the agency authorized to intercept the communications, and of the person authorizing the application; . . . .

- 18 -

order could have been the person who authorized the wiretap applications.[9] Because numerous offices with numerous officeholders are listed in the instant orders, no individual has been identified as the authorizing official. Thus, we find these orders to be facially insufficient in violation of § 2518(10)(a)(ii).

In Chavez, however, after the Court concluded that the order was facially sufficient, it went on to consider whether the order was "unlawful" under § 2518(10)(a)(i). In considering this question, it articulated the appropriate framework for determining whether wiretap evidence must be suppressed under § 2518(10)(a). It found that the order in question was "unlawful" under 10(a)(i) because it violated the statutory requirement of § 2518(4)(d). It went on to hold, however, that even where a wiretap is found to be "unlawful" under (10)(a)(i), suppression is not required if the violated provision of Title III "does not establish a substantive role to be played in the regulatory system." Chavez, 416 U.S. at 578. This holding was reiterated in Giordano, which stated that suppression is only required under (10)(a)(i) when there is a "failure to satisfy any of those statutory requirements that directly and substantially implement the

---

[9] This case is distinguishable from United States v. Traitz, 871 F.2d 368, 379 (3d Cir. 1989), which held that an order was facially sufficient when it identified the "Assistant Attorney General, Criminal Division" as the authorizing official. Because there is only one Assistant Attorney General of the Criminal Division, no confusion could possibly result from the fact that the authorizing official was identified by his title rather than his name.

- 19 -

congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." Giordano, 416 U.S. at 527; United States v. Armendariz, 922 F.2d 602, 608 (10th Cir. 1991).

Chavez and Giordano articulated this second requirement specifically with respect to motions to suppress under (10)(a)(i). Chavez, 416 U.S. at 574-75; Giordano, 416 U.S. at 527-28. We now join our sister circuits in holding that this requirement is equally applicable to motions to suppress under § 2518(10)(a)(ii), which permits suppression if the order is facially insufficient. United States v. Moore, 41 F.3d 370, 374 (8th Cir. 1994) ("[E]very circuit to consider the question has held that § 2518(10)(a)(ii) does not require suppression if the facial insufficiency of the wiretap order is no more than a technical defect."); Traitz, 871 F.2d at 379; United States v. Lawson, 545 F.2d 557, 562 (7th Cir. 1975); United States v. Swann, 526 F.2d 147, 149 (9th Cir. 1975); United States v. Erdman, 515 F.2d 290, 293 (6th Cir. 1975); United States v. Acon, 513 F.2d 513, 517-19 (3d Cir. 1975); United States v. Robertson, 504 F.2d 289, 292 (5th Cir. 1974).

Thus, because we have concluded that these orders are facially insufficient, we apply this second requirement and ask whether this failure to comply with

Title III requires suppression in this case. Chavez, 416 U.S. at 574-75; Giordano, 416 U.S. at 524-29. We find that it does not.

First, the only provision of Title III violated in this case is § 2518(4)(d), which requires that the authorizing official be identified in the order. As noted in Chavez, this provision "does not establish a substantive role to be played in the regulatory system." Chavez, 416 U.S. at 577-78; Lawson, 545 F.2d at 562 ("Because [§ 2518(4)(d)] was merely designed to fix responsibility, it does not establish a substantive role and as a technical violation does not require suppression."); cf. Giordano, 416 U.S. at 528 (holding that suppression was required when the violated provision "was intended to play a central role in the statutory scheme"); United States v. Donovan, 429 U.S. 413, 437 (1977) (not requiring suppression where "nothing in the legislative history suggests that Congress intended [the requirement at issue] to play 'a central, or even functional, role in guarding against unwarranted use of wiretapping or electronic surveillance'") (citing Chavez, 416 U.S. at 578).

Second, the purpose of § 2518(4)(d) is to fix responsibility with the person who authorized the application. Chavez, 416 U.S. at 572 (quoting S. Rep. No. 1097, 90th Cong., 2d Sess., 101 (1968)). We find that the defects in the instant orders did not subvert this purpose. In this case, an appropriate official from the Department of Justice authorized every application, and Judge Kane knew that

official's identity when he granted the orders. Even further, from the moment he knew of his indictment, Defendant himself knew the identity of the officials who authorized the applications. Thus, as the district court found, the facial insufficiency here was a technical defect that did not disrupt the purposes of the wiretap statute or cause any prejudice to Defendant.[10] See Traitz, 871 F.2d at 380 (holding that the purpose of § 2518(4)(d) was not undermined where the authorizing official was named in the wiretap application but not in the wiretap order); Lawson, 545 F.2d at 562 (holding that the purpose of § 2518(4)(d) was not undermined where the wiretap order named an official without statutory authority to authorize the application, but the Attorney General had in fact authorized the application); Swann, 526 F.2d at 149 (same).

The district court's denial of Defendant's motion to suppress is AFFIRMED.

## IV. SENTENCING

At his sentencing hearing, Defendant requested a downward departure under Sentencing Guideline § 5K2.12. Defendant argued that he was coerced into

---

[10]We note that, if the wiretap application in this case had in fact been authorized by an official without authority to do so, Defendant would have a remedy under § 2518(10)(a)(i).

committing his crimes because of his co-dependent relationship with his drug-addicted wife.

Tenth Circuit precedent makes clear that a district court's denial of a downward departure will be reviewed by an appellate court only if "the district court states that it does not have any authority to depart from the sentencing guideline range for the entire class of circumstances proffered by the defendant." United States v. Browning, 252 F.3d 1153, 1161 (10th Cir. 2001) (quoting United States v. Castillo, 140 F.3d 874, 887 (10th Cir. 1998)). Moreover, "[t]he district court's statement that it lacks authority to grant the requested downward departure must be unambiguous." Id. (United States v. Fortier, 180 F.3d 1217, 1231 (10th Cir. 1999)).

In this case, the district court's language indicates that it simply did not think a departure was warranted for the type of coercion that Defendant alleged. The court did not state that psychological coercion could never be the basis of a downward departure, but that the coercion here was not serious enough to warrant one. This does not satisfy the requirement for appellate review. As a result, we DISMISS this portion of Defendant's appeal.

For the foregoing reasons, Defendant's conviction and sentence are AFFIRMED.