**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 9, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

CURTIS BENDER,

     Defendant - Appellant.

No. 04-3377
(D.C. No. 04-CR-10032-WEB)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **McCONNELL** and **BALDOCK**, Circuit Judges, and **ARMIJO**,[**] District Judge.[***]

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**] The Honorable M. Christina Armijo, United States District Judge for the District of New Mexico, sitting by designation.

[***] After examining the briefs and the appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

A jury convicted Defendant-Appellant Curtis Bender on all counts charged in an Indictment charging him with conspiracy to distribute cocaine, 21 U.S.C. §§ 841(a)(1) and 846; distribution of cocaine, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; attempt to distribute cocaine, 21 U.S.C. § 846 and 18 U.S.C. § 2; possession of a firearm in furtherance of a drug trafficking crime, *to wit*, attempt to distribute cocaine, 18 U.S.C. § 924(c) and 18 U.S.C. § 2; and possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Conceding that there appear to be no non-frivolous arguments that would allow him to challenge the drug convictions, Mr. Bender raises as the sole issue on appeal whether there was sufficient evidence to convict him of the charge set forth in Count 6, possession of a firearm in furtherance of an attempt to distribute cocaine. Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

*Background*

Curtis L. Bender is the former sheriff of Trego County, Kansas. He was sheriff in March 2001 when Jeff Mattheyer bought a vehicle at a sheriff's sale and discovered three packages of cocaine hidden inside. Mattheyer turned the cocaine over to Sheriff Bender, who later claimed both orally and on a police department evidence log that he had destroyed it. In fact, he destroyed two of the packages and kept the third in the event he needed to do "controlled buys."

Mr. Bender was still Trego County Sheriff in the early months of 2003 when he befriended an arrestee named Frank Casto, who had been booked into the Trego County

jail after having been arrested for possession of marijuana.  When Casto was arrested, his children were removed from his home.

After a week in the Trego County jail, Casto was released on bond.  Although Casto and Mr. Bender had not known each other before Casto's arrest, Casto and his wife soon became close friends with Mr. Bender and his wife.  Casto testified that the couples would dine together at least once a week at the Bender home in Wakeeney, Kansas, and that they would also take occasional outings together.  Between late February and late March 2003, Casto would usually see Mr. Bender once a day.

It was during this time that Casto discussed his drug history with Mr. Bender.  It was also during this time that Casto, who had prior to February 2003 worked as a confidential informant ("CI") for both the Colby (Kansas) Police Department and the Quad County (Kansas) Drug Task Force, informed Mr. Bender of his past work as a CI.  According to Casto, his decision to work as a CI was motivated by a desire to help his friend, Steve Babcock, who had gotten into drug-related trouble.  Casto testified that Mr. Bender offered to help get his children returned to him if Casto would work for him as a CI and help him "nail" an individual named Tim Mauk, whom Mr. Bender believed was "dirty."  Casto understood that Mr. Bender intended to have Mauk sell cocaine to an individual known as Chewy as part of a "reverse sting" operation.  "Chewy" was actually Kansas Bureau of Investigation (KBI) Agent Keith Randall Lumry, who was operating in an undercover capacity.

3

On the evening of March 22, 2003 and in an effort to locate Mauk and Chewy, Casto and Mr. Bender drove to Dodge City, Kansas in Mr. Bender's personal pickup truck. The men stayed in Dodge City for approximately 45 minutes to an hour but could not find either Mauk or Chewy. Having been unsuccessful in their efforts, they decided to return to Trego County.

According to Casto, Mr. Bender was "real agitated" on the return trip and was upset that he could not find Mauk or Chewy because "he wanted this deal . . . to go down." Casto testified that during the drive back to Wakeeney, Mr. Bender spoke of his financial difficulties and confirmed that the purpose of the trip to Dodge City was to sell cocaine. It was also on the return trip that Mr. Bender told Casto that there was cocaine in the back seat of the pickup truck. Casto saw the cocaine wrapped in a white towel in the truck. At some point during the drive back from Dodge City, Mr. Bender asked Casto to contact people Casto thought could sell or "turn" the cocaine. From the pickup truck and using Mr. Bender's cell phone, Casto called Steve Babcock and an individual he knew only as Truitt. Casto spoke to Truitt just briefly before Truitt expressed no interest in selling cocaine and hung up. Babcock, however, agreed to meet Casto when Casto arrived home in Wakeeney that night.

Casto and Mr. Bender arrived in Wakeeney at approximately 12:30 a.m. March 23, 2003. Approximately 45 minutes later, Babcock arrived at Casto's home. Casto introduced Babcock and Mr. Bender, who had never met before. Casto testified that he and Babcock were in Casto's kitchen when he showed Babcock the cocaine. Casto

4

described the package of cocaine as measuring approximately nine inches by six inches, with a depth of approximately one and one-half inches. The men then descended into Casto's basement where Casto, at Mr. Bender's direction and using Mr. Bender's pocket knife, cut a two-inch sample of the cocaine and gave it to Babcock. Casto testified that Mr. Bender told Babcock that if he sold the cocaine, he would pay Babcock with a boat. After Casto gave Babcock the sample, Babcock left and Casto drove Mr. Bender home before returning to his own home. Casto testified that Mr. Bender took the remainder of the cocaine with him. According to Casto, Mr. Bender was with Casto and Babcock the entire time they were in the basement.

Babcock's testimony with respect to the events of the early morning hours of March 23, 2003 was somewhat different from Casto's, but not materially different. According to Babcock, he received a telephone call from Casto about midnight on March 22, 2003, asking Babcock to come to Casto's home. Babcock confirmed that when he arrived at Casto's home, he, Casto, and Mr. Bender went into Casto's kitchen, where Casto cut open a package of cocaine with a knife provided by Mr. Bender. Babcock estimated that the package weighed a "couple of pounds." Babcock, who had used cocaine in the past, tasted the cocaine. The three men then went into Casto's basement where Casto placed a chunk of the cocaine into a bag. Unlike Casto, who testified that Mr. Bender was with him and Babcock the entire time they were in the basement, Babcock testified that Mr. Bender went upstairs to retrieve tape and something in which to package the cocaine. Mr. Bender then returned to the basement and he and Casto taped

5

and wrapped the cocaine. According to Babcock, Casto instructed him to sell the cocaine and Mr. Bender told Babcock that once he had sold all of it, he could return for more. Babcock also testified that it was Casto who told him that if he sold the cocaine, Mr. Bender would pay him with a boat. Babcock estimated that he was given approximately a quarter of a pound of cocaine to sell. Babcock testified that the three men then left Casto's home and drove to the Bender residence. Once there, Mr. Bender directed Casto to place the cocaine in a high spot behind a hot tub. Casto, Mr. Bender, and Babcock then proceeded to test the purity of a sample of the cocaine by placing some of it in a spoon with water and heating the mixture with a lighter. Babcock then went home, where he buried the cocaine in his backyard.

Later that same day, March 23, 2003, Casto and Mr. Bender undertook another search for Tim Mauk. This time they found Mauk at his house in Wakeeney. Casto testified that Mr. Bender spoke with Mauk about the anticipated sale of cocaine to Chewy. According to Casto, Mauk made Chewy out to be a major drug dealer and told Mr. Bender that Chewy "was going to come through" and was "the for-real deal." Casto and Mr. Bender then left Mauk and went to the Bender residence. Later that evening, however, Casto and Mr. Bender returned to Mauk's house in another of Mr. Bender's personal vehicles in order to provide Mauk a sample of the cocaine. Mauk accepted the sample and ingested it, having opened the package with Mr. Bender's pocket knife. Casto testified that he and Mr. Bender were providing Mauk with a sample so that Mauk would vouch for the cocaine's quality with Chewy who, in turn, "would know that this

6

was a for real deal and bite into it." Casto also testified that before leaving Mauk that evening, the three men discussed and made arrangements for the meeting with Chewy.

On March 24, 2003, Casto and Mr. Bender again discussed the anticipated sale of cocaine to Mauk and Chewy. Mr. Bender told Casto that the transaction was going to take place on March 25, 2003, "in town or out of town, edge of town[,]" meaning Wakeeney. Accordingly, on March 25, 2003, Mr. Bender telephoned Casto at work in Gove County and told Casto to come home to Wakeeney during lunch. Casto testified that he arrived in Wakeeney at approximately 11:00 a.m. and went to the Bender residence. From there, the two men drove in Mr. Bender's personal pickup truck to the sheriff's office. Casto waited in the truck while Mr. Bender went inside to make telephone calls. Mr. Bender then returned to the truck and the two men drove back to the Bender residence, where Casto witnessed Mr. Bender retrieve his badge and gun and place them in the truck. They then proceeded out of town, stopping about four miles south of Wakeeney to pick up a package of cocaine that Mr. Bender had hidden in a culvert by the side of the road. Casto, at Mr. Bender's direction, retrieved the cocaine, which he recognized as the same package of cocaine that he had had at his house and from which he had provided Steve Babcock a sample.

The men then headed to a motel in Hays, Kansas. Hays is in Ellis County. Casto testified that during the drive to Hays, both he and Mr. Bender used Mr. Bender's phone to confirm the meeting with Chewy and to find out in which motel room they could expect to find him. According to Casto, he spoke to both Tim Mauk and Chewy. KBI

7

Agent Lumry, who was posing as Chewy, confirmed that, as he waited in room 154 of the Hays Hampton Inn, he spoke to "the Bender/Casto team" on Tim Mauk's telephone, and overheard Mauk doing the same. Agent Lumry testified that five telephone calls were made between him and Mauk and Casto and Mr. Bender, during which the men continued to make arrangements for the sale of cocaine; confirmed that "Chewy" and Mauk would be prepared with the money and Casto and Mr. Bender with the drugs; and made sure that it was safe to complete the deal. According to Agent Lumry, who testified that he assumed he was speaking with Mr. Bender at this time, he was "strongly urged" to come to Wakeeney to do the deal. For safety reasons, Agent Lumry refused and at one point the sale was canceled. However, Mr. Bender then called back and agreed to meet in Hays. Agent Lumry testified that he understood that he was expected to pay $60,000 in exchange for the cocaine.

Once Mr. Bender and Casto reached Hays, Mr. Bender dropped Casto off at a gas station approximately a block or a block and a half from the motel. Mr. Bender then instructed Casto to deliver the cocaine to Chewy in Room 154 of the Hampton Inn. Casto did as instructed. When he arrived at Chewy's room, Casto showed Chewy the cocaine. Chewy showed Casto $16,200 and told Casto that the remainder of the money was in his truck. When Chewy opened the door to head to the parking area and his vehicle, KBI agents rushed into the room and placed Casto under arrest.

At the time the drugs and money were being exchanged, Mr. Bender was standing outside his truck in the parking lot of a Phillips 66 gas station east of the Hays Hampton

8

Inn, holding his infant son. Trial testimony revealed that the Hampton Inn, though not Room 154, was visible from where Mr. Bender was standing. Special Agent Chris Bumgarner of the KBI, who was conducting vehicle surveillance in connection with the undercover operation taking place at the Hampton Inn, secured a warrant to search Mr. Bender's pickup truck. In the truck, SA Bumgarner found a loaded Glock 21, .45 caliber automatic pistol in the bottom right-hand corner behind the seat on the floorboard. Trial testimony revealed that Mr. Bender neither secured nor sought permission to conduct a "reverse sting" operation or any other drug investigation in Ellis County.

The jury convicted Mr. Bender on all counts. Judgment was entered on September 22, 2004. A timely notice of appeal was filed on September 29, 2004. Mr. Bender raises as the sole issue on appeal whether there was sufficient evidence to convict him of the charge set forth in Count 6, possession of a firearm in furtherance of an attempt to distribute cocaine.

*Discussion*

We review a claim of insufficient evidence *de novo*, asking "only whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." United States v. Radcliff, 331 F.3d 1153, 1157 (10th Cir. 2003) (internal quotation omitted). We examine the evidence in the light most favorable to the prosecution "'to determine whether any rational trier of fact could have found the essential elements of the crime beyond a

9

reasonable doubt.'" United States v. Brooks, 438 F.3d 1231, 1236 (10th Cir. 2006) (quoting United States v. Miller, 987 F.2d 1462, 1464 (10th Cir.1993)). It is not our duty to weigh conflicting evidence or to consider the credibility of witnesses; in this respect, we must defer to the jury's resolution. Id. Nor do we examine the evidence in "bits and pieces." Instead, we evaluate the sufficiency of the evidence by considering the collective inferences to be drawn from the evidence as a whole. Brooks, 438 F.3d at 1236 (internal quotation omitted). Indeed, a conviction based upon allegedly insufficient evidence will not be reversed unless no rational trier of fact could have reached the disputed verdict. United States v. Wilson, 182 F.3d 737, 742 (10th Cir. 1999). Finally, the evidence "need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt." United States v. Parrish, 925 F.2d 1293, 1297 (10th Cir.1991). Instead, the evidence, along with reasonable inferences to be drawn therefrom, need only reasonably support the jury's finding of guilt beyond a reasonable doubt. See Brooks, 438 F.3d at 1236.

*1. Whether the Evidence Was Sufficient to Allow the Jury to Find that Mr. Bender Possessed a Weapon in Furtherance of a Drug Trafficking Crime*

We first consider Mr. Bender's argument that he did not possess a weapon "in furtherance of" any crime. Section 924(c)(1)(A) of Title 18 of the United States Code provides, in pertinent part, that

> any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such

10

crime of violence or drug trafficking crime . . . be sentenced
to a term of imprisonment of not less than 5 years . . . .

18 U.S.C. § 924(c)(1)(A).  Mr. Bender was charged and convicted under the "in furtherance of" prong.  "The 'in furtherance of' element of § 924(c) requires the government to show that possession of the firearm furthered, promoted or advanced the drug trafficking crime."  United States v. Jenkins, 313 F.3d 549, 559 (10th Cir. 2002) (citing United States v. Avery, 295 F.3d 1158, 1175 (10th Cir.2002)).  The "in furtherance of" prong demands a stricter showing of proof than the "during and in relation to" prong and requires the government to demonstrate a direct connection between the firearm and the drug offense.  United States v. Basham, 268 F.3d 1199, 1207 (10th Cir. 2001) (citing  United States v. Iiland, 254 F.3d 1264, 1271-74 (10th Cir. 2001)).

In Basham, we approved consideration of the following non-exhaustive factors in determining whether a firearm was used in furtherance of a drug trafficking crime:  the type of drug activity being conducted, accessibility of the firearm, the type of weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found. Basham, 268 F.3d at 1207.  We emphasized that "[m]ere presence of a firearm at the scene is not enough to find possession in furtherance of a drug trafficking crime, because the firearm's presence may be coincidental or entirely unrelated to the underlying crime."  Id. at 1206.  We also explained, however, that "a firearm that is kept available for use if needed during a drug transaction is 'possessed in

11

furtherance of' drug trafficking, because such possession does not necessarily require 'use' as long as such possession 'in furtherance of' is the intent of the drug trafficker." Id. at 1208; accord United States v. Robinson, 435 F.3d 1244, 1251 (10th Cir. 2006). The non-exhaustive factors listed above are relevant and helpful to a jury attempting to discern the defendant's intent in possessing a weapon. Basham, 268 F.3d at 1208. Evidence adduced at trial that bears on these factors is reviewed below.

The type of drug activity being conducted involved a government official attempting to sell cocaine that had been entrusted to him by the private citizen who discovered it. The evidence adduced at trial established that Mr. Bender's scheme to sell cocaine was hatched at least two days before Casto actually made contact with Chewy at the Hays Hampton Inn. On that day Mr. Bender drove to Dodge City with the cocaine in his possession to locate Mauk and Chewy for the purpose of selling the drug. His efforts to secure a buyer continued after these early attempts were unsuccessful, when he was then able to establish contact with Chewy and Mauk for the motel room transaction.

Mr. Bender continues to argue that his activities were part of a legitimate law enforcement "reverse sting" operation. However, evidence adduced at trial established that (1) no other law enforcement personnel were made aware of the "sting;" (2) Mr. Bender did not obtain permission from other law enforcement personnel to conduct such an operation in a neighboring county; and (3) the drugs involved in the transaction were the same drugs that Mr. Bender falsely claimed both orally and on a police department evidence log to have destroyed. A jury could reasonably conclude that an individual

12

attempting to consummate the sale of cocaine under these circumstances, irrespective of whether or not it was a lawful "reverse sting" operation, would likely be armed.

Turning to the "accessibility of the firearm" element, we are unpersuaded by the argument that the weapon was not accessible when Casto was in the Hampton Inn because, at that moment, Mr. Bender was outside his truck holding his child, while his gun was under a seat in the vehicle. The gun was, as Mr. Bender concedes, in his private vehicle outside of which he was standing. The jury could have found that if Mr. Bender had put his child down or handed the child to his wife, who also was present at the scene, he could easily have retrieved the gun. In short, a reasonable jury could have found that the loaded gun was being kept available for use if needed. See Basham, 268 F.3d at 1208. Thus, the evidence was sufficient to allow the jury to conclude that the weapon was accessible to Mr. Bender.

While the weapon, a Glock 21, .45 caliber automatic pistol, was neither stolen nor in the actual possession of Casto as he carried the drugs into the Hampton Inn, trial testimony revealed that the gun was loaded at the time of its discovery, and that it was with the cocaine in the Bender pickup for the drive to Hays, Mr. Bender having specifically stopped at his home to retrieve the gun before picking up the cocaine from the roadside culvert where it had been stashed. As noted above, evidence presented at trial revealed that Mr. Bender not only lacked authority to conduct his alleged "reverse sting" operation in Ellis County but also had never spoken to Ellis County law enforcement authorities about conducting such an operation in their jurisdiction. From

13

this evidence, the jury could have reasonably rejected any notion that Mr. Bender possessed the firearm for legitimate purposes. From this evidence, the jury also could reasonably have concluded that Mr. Bender intended to possess the firearm in furtherance of drug trafficking. See Basham, 268 F.3d at 1208 (Basham factors relevant and helpful to jury attempting to discern defendant's intent in possessing weapon). We conclude that the evidence was sufficient to allow the jury to find that the Defendant possessed a weapon in furtherance of a drug trafficking crime.

*2. Whether the Evidence Was Sufficient to Allow the Jury to Find that Mr. Bender Possessed a Weapon in Furtherance of the Charged Crime, to wit, the Attempt to Distribute Cocaine*

We are similarly unpersuaded by Mr. Bender's next argument that, even assuming there existed sufficient evidence to find him guilty of possession of a firearm in furtherance of *a* drug trafficking crime, the evidence was not sufficient to find that he possessed a firearm in furtherance of the charged crime, *to wit*, an attempt to distribute cocaine. His argument is premised on his assumption that the "substantial step" required to sustain a conviction for attempt did not occur until Casto approached the Hampton Inn on foot, walking away from the Bender vehicle in which the firearm was located.

To establish attempt, the government must show (1) the requisite intent, and (2) commission of an act constituting a substantial step toward commission of the substantive offense. United States v. Smith, 264 F.3d 1012, 1015 (10th Cir. 2001).

> The "substantial step" required to establish an attempt must be something beyond mere preparation. It must be an act adapted to, approximating, and which in the ordinary and

14

likely course of things will result in, the commission of the particular crime. A substantial step is an appreciable fragment of a crime and an action of such substantiality that, unless frustrated, the crime would have occurred. The step must be strongly corroborative of the firmness of the defendant's criminal intent and must unequivocally mark the defendant's acts as criminal. It should evidence commitment to the criminal venture. However, it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt.

Id. at 1016. The determination as to whether an action amounts to a substantial step or mere preparation is highly fact specific. Id.

In this case, the jury could reasonably have concluded that Mr. Bender's attempt to distribute cocaine began well before Casto approached the Hampton Inn on March 25, 2003. The evidence revealed that as early as March 23, 2003, Mr. Bender provided cocaine to Steve Babcock with the intent that Babcock sell or "turn" it. The jury could reasonably have believed that Mr. Bender was an active participant in the dealings with Babcock and that his actions evidenced an intent to distribute cocaine by crediting trial testimony that (1) the men used Mr. Bender's pocket knife to cut open the packet of cocaine from which Babcock was given a sample; (2) Mr. Bender instructed Babcock on selling the cocaine and discussed payment with him; (3) Mr. Bender helped tape and wrap the cocaine for Babcock; and (4) Mr. Bender brought the remainder of the cocaine back to his house from Casto's house. The jury could also have believed that Mr. Bender's attempt to distribute cocaine began later in the day of March 23, 2003, when he drove

15

with Casto to Tim Mauk's house and delivered a cocaine sample to Mauk, who was described at trial as being the "middleman" in the sale to Chewy. See United States v. Lam Kwong-Wah, 924 F.2d 298, 301 (D.C. Cir. 1991) (attempted distribution of heroin began when terms of deal negotiated and samples delivered to undercover FBI agents).

Or the jury could have believed that Mr. Bender's attempt to distribute cocaine began on March 25, 2003, either when he stopped outside Wakeeney to retrieve the cocaine from the roadside culvert, or when he and Casto spoke by telephone to both "Chewy" (KBI Agent Lumry) and Tim Mauk about the specifics of the anticipated sale. To be sure, Agent Lumry testified that he was present with Tim Mauk in Room 154 of the Hampton Inn on the morning of March 25, 2003 when five telephone calls were made between Mauk and "the Bender/Casto team" regarding the deal and the logistics of the cocaine sale. Agent Lumry testified that because he determined that one of Mauk's conversations with Mr. Bender and Casto was becoming "heated," he grabbed the phone from Mauk and spoke directly to an individual he assumed to be the Defendant. According to Agent Lumry, he and the person to whom he spoke "made arrangements for the deal," which Agent Lumry was urged to consummate in Wakeeney, and which Agent Lumry refused to do. After one phone call during which the sale was canceled, Agent Lumry was called back and advised that the sale would occur in the Hays motel room. During these phone calls, Agent Lumry learned that Casto and Mr. Bender were expecting $60,000 in exchange for the cocaine. These telephone conversations confirmed

16

the terms and firm arrangements for the sale of cocaine at the Hays Hampton Inn and ensured that the deal would be completed.

The record discloses that the logistics of the transaction having been confirmed by telephone, Mr. Bender then dropped Casto off at a location near the motel and directed him to go to the agreed upon motel room for the sale. The record further discloses that Mr. Bender then waited outside his pickup, which had been parked sufficiently near the motel that the motel was visible from the truck. From this evidence, the jury could reasonably infer that Mr. Bender waited for Casto to complete the transaction. We conclude that the evidence was sufficient to allow the jury to find that these events were indicative of Bender's requisite intent to distribute cocaine and also represented a substantial step toward that distribution. See Smith, 264 F.3d at 1015-16. For the foregoing reasons, we conclude that the evidence provided a sufficient basis for a reasonable jury to conclude that the Defendant violated 18 U.S.C. § 924(c).

*Conclusion*

For the foregoing reasons, we conclude that sufficient evidence existed to support the jury's verdict of guilty on Count 6, the unlawful possession of a firearm in furtherance of a drug trafficking crime, *to wit*, the attempt to distribute cocaine. Accordingly, we **AFFIRM** the judgment of the district court.

ENTERED FOR THE COURT,


M. Christina Armijo
District Judge Sitting by Designation

17